Case Nos. 24-1317, 24-1318, 24-1385
United States Court of Appeals for the First Circuit

---

**ASSOCIATION TO PRESERVE AND PROTECT LOCAL
LIVELIHOODS; B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C.,
d/b/a Harborside Hotel; B.H.W.W., L.L.C.; DELRAY EXPLORER
HULL 495 LLC; DELRAY EXPLORER HULL 493 LLC; ACADIA
EXPLORER 492, LLC; PENOBSCOT BAY AND RIVER PILOTS
ASSOCIATION**,

*Plaintiffs - Appellants/Cross-Appellees*

v.

**CHARLES SIDMAN**,

*Defendant - Appellee/Cross-Appellant,*

**TOWN OF BAR HARBOR**,
a Municipal Corporation of the State of Maine,

*Defendant-Appellee.*

---

On appeal from the United States District Court
for the District of Maine
Civil Action No. 1:22-cv-416-LEW

---

**BRIEF OF DEFENDANT-APPELLEE TOWN OF BAR HARBOR**

Jonathan P. Hunter, Bar No. 1210939
Stephen W. Wagner, Bar No. 1212086
RUDMAN WINCHELL
84 Harlow Street, P.O. Box 1401
Bangor, ME 04402
207.947.4501

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................i

TABLE OF AUTHORITIES........................................................iii

STATEMENT OF ISSUES ............................................................1

STATEMENT OF THE CASE .......................................................2

*Factual Background*..................................................................2

*Procedural History*..................................................................8

SUMMARY OF ARGUMENT ...................................................10

ARGUMENT ...............................................................................11

I.     Federal Law Does Not Preempt the Ordinance. ..............11

  A.    The Ordinance Is Not Preempted By the "Federal Interest in Maritime Matters." ............................................13

  B.    The Ordinance Does Not Conflict With Federal Laws Regarding Customs and Immigration Screening. ......................18

  C.    The Ordinance Does Not Conflict With Federal Laws Designating Anchorages. ................................................20

  D.    The Seafarer Shore Access Issue Is Moot. ...................22

II.    The Ordinance Does Not Violate the Dormant Commerce Clause...............................................................26

  A.    The Ordinance Does Not Discriminate Against Interstate or Foreign Commerce. ..........................................30

B.    The Ordinance Does Not Impose a "Clearly Excessive" Burden on Interstate or Foreign Commerce in Relation to its Local Benefits. ...................................................................39

C.    The Ordinance Does Not Regulate "Instrumentalities" of Interstate Commerce or Unduly Impede the "Flow of Commerce." ...........................................................47

III.   The Ordinance Does Not Violate APPLL's Due Process Rights. ............................................................................52

IV.   APPLL Has Neither Pleaded Nor Proven a Violation of the Right to Travel. ................................................................54

V.    The Maine Pilotage Act Does Not Preempt the Ordinance. ..........58

**CONCLUSION**...............................................................**62**

**CERTIFICATE OF COMPLIANCE** .................................**63**

**CERTIFICATE OF SERVICE**..........................................**63**

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*All. of Auto. Mfrs. v. Gwadosky*,
430 F.3d 30 (1st Cir. 2005).........................................13, 28, 30,
                                                                  36, 39

*All. of Auto. Mfrs. v. Gwadosky*,
304 F. Supp. 2d 104 (D. Me. 2004)...........................................32

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008)...........................12-13

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997) .....................................................23

*Askew v. Am. Waterways Operators, Inc.*,
411 U.S. 325 (1973) ...................................................16

*Attorney Gen. of N.Y. v. Soto-Lopez*,
476 U.S. 898 (1986) ...................................................57

*Ayotte v. Planned Parenthood*, 546 U.S. 320 (2006) .................24

*Bankers Life & Casualty Co. v. Crenshaw*,
486 U.S. 71 (1988) ....................................................53

*Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959) .................49-52

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ...........24

*Chafin v. Chafin*, 568 U.S. 165 (2013) ....................................23

*Cole v. Housing Auth.*, 435 F.2d 807 (1st Cir. 1970) ...............57

*Consumer Data Indus. Ass'n v. Frey*,
26 F.4th 1 (1st Cir. 2022) .......................................11-12

iii

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008) ................................ 52-53

*Cumpiano v. Banco Santander Puerto Rico*,
902 F.2d 148 (1st Cir. 1990) ...................................................... 45

*Dahnke-Walker Milling Co. v. Bondurant*,
257 U.S. 282 (1921) .................................................................... 24

*De Mercadeo v. Emanuelli-Hernández*,
72 F.4th 361 (1st Cir. 2023) ...................................................... 55

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) .............. 28, 40

*Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978) .............. 33-34, 42-44

*Family Winemakers of Cal. v. Jenkins*,
592 F.3d 1 (1st Cir. 2010) .......................................................... 38

*Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996) ........................ 26

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ..................... 28-29, 31-32, 40

*Graham v. Richardson*, 403 U.S. 365 (1971) ............................ 20

*Houlton Citizens' Coal. v. Town of Houlton*,
175 F.3d 178 (1st Cir. 1999) ...................................................... 28, 32, 44

*Houston v. FAA*, 679 F.2d 1184 (5th Cir. 1982) ........................ 56

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) .............................. 29

*Huron Portland Cement Co. v. City of Detroit*,
362 U.S. 440 (1960) .................................................................... 14

*Kenyon v. Cedeno-Rivera*, 47 F.4th 12 (1st Cir. 2022) .............. 52

iv

*Lewis v. Bt Inv. Managers*, 447 U.S. 27 (1980)..........................26

*Maine v. Taylor,* 477 U.S. 131 (1986)........................................27

*McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13 (1st Cir. 1991).......55

*Me. Forest Prods. Council v. Cormier*,
586 F. Supp. 3d 22 (D. Me. 2022)..............................................20

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................12

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999)...........................56

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981) ...................................................................35

*Mulero-Carrillo v. Román-Hernández*,
790 F.3d 99 (1st Cir. 2015)....................................................53, 56

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ...........................................................*passim*

*Op. of the Justices*, 2017 ME 100, 162 A.3d 188.....................24, 38

*Philadelphia v. New Jersey*, 437 U.S. 617 (1978) .....................35

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)......................*passim*

*Portland Pipe Line Corp. v. City of S. Portland*,
332 F. Supp. 3d 264 (D. Me. 2018)......................................28, 31-33,
                                                                                        36, 38, 46

*Portland Pipe Line Corp. v. City of S. Portland*,
288 F. Supp. 3d 321 (D. Me. 2017)........................................13, 15

*Portland Pipe Line Corp. v. City of S. Portland*,
2020 ME 125, 240 A.3d 364 .....................................................58

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........................................................... 11

*Ray v. Atlantic Richfield Co.*,
435 U.S. 151, 168-69 (1978) .................................................... 14, 16-17

*Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) ..... 51

*Romero v. Int'l Terminal Operating Co.*,
358 U.S. 354 (1959) .................................................................. 15

*S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945).....50-52

*Saenz v. Roe*, 526 U.S. 489 (1999)..........................................56-57

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009) ....28

*Solze v. Shinseki*, 26 Vet. App. 299 (2013)...............................23

*South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018) ................27, 48

*Takahashi v. Fish & Game Com.*, 334 U.S. 410 (1948)............19

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .................................................................28

*Toll v. Moreno*, 458 U.S. 1 (1982)............................................20

*Town of Southold v. Town of E. Hampton*,
477 F.3d 38 (2d Cir. 2007)......................................................29-30, 56

*United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007)...........53

*United States v. Locke*, 529 U.S. 89 (2000) ..............................16-17

*United States v. Morales-Vélez*,
100 F.4th 334 (1st Cir. 2024) ..................................................23

*United States v. Slade*, 980 F.2d 27 (1st Cir. 1992)................20, 55

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ..............54

*Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005) ...............29-30

*Wawenock, LLC v. Dep't of Transp.*,
2018 ME 83, 187 A.3d 609 .......................................24, 38

*Wyeth v. Levine*, 555 U.S. 555 (2009).........................................12

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3 .......................................26

U.S. Const. art. III, § 2............................................23

U.S. Const. art. VI, cl. 2 ..........................................11

Me. Const. art. VIII, pt. 2, § 1 ...................................58

## Statutes and Rules

30-A M.R.S. § 3001 .................................................58

38 M.R.S. §§ 1-13..................................................58

38 M.R.S. § 7......................................................58-59

38 M.R.S. §§ 85 *et seq.* ..........................................58

38 M.R.S. § 85.....................................................59

38 M.R.S. §§ 86, 86-A, 87-A, 89-90.................................59

38 M.R.S. §§ 90(1)(B), 96..........................................59

38 M.R.S. § 97.....................................................60

P.L. 1985, c. 389, § 33.................................................................60

33 C.F.R. § 105.200 .............................................................7-8

33 C.F.R. § 105.237 .........................................................1, 8, 22

33 C.F.R. ch. I, subch. I, pts. 109-110 ...............................20-21

33 C.F.R. § 110.130 ................................................................21

## Other Authorities

Bar Harbor Code ch. 52............................................................23

Bar Harbor Code § 52-5...........................................................23

Bar Harbor Code § 125-77(H) ...................................................7

# STATEMENT OF ISSUES

1.      Whether the Ordinance at issue is preempted by general federal maritime laws, federal laws relating to customs and immigration, or the Coast Guard's designation of anchorages in Frenchman Bay.

2.      Whether the issue of preemption based on seafarer shore access pursuant to 33 C.F.R. § 105.237 is moot, and, if not, whether the district court properly declined to enjoin the Ordinance in toto based on a hypothetical, partial preemption problem.

3.      Whether the Ordinance violates the dormant Commerce Clause, either by discriminating against or unduly burdening interstate commerce.

4.      Whether the Ordinance violates due process.

5.      Whether any argument based on the constitutional right to travel has been properly preserved and presented to this Court, and if so, whether the Ordinance violates that right.

6.      Whether Maine's pilotage statute preempts the Ordinance.

## STATEMENT OF THE CASE

*Factual Background*

Cruise ship visitation to Bar Harbor began in the late 1980s. (7/13/23 Tr. at 136.)[1] Over the years, as the frequency and magnitude of these visits increased, the cruise industry began to have increasingly negative impacts on Bar Harbor. (7/13/23 Tr. at 114, 136-37, 231.) The Town's 2007 Comprehensive Plan recognized problems associated with cruise ship visitation, including congestion, water quality, and changes in the character of the Town making it a less desirable place to live and work. (Defendants' Exhibit ("DX") 250A at 77, 85, 217-21, 344, 346, 351, 368-70, 396-97; 7/13/23 Tr. at 115-18). In 2007, the Town commissioned a study on how to manage cruise ship tourism in Bar Harbor. (7/13/23 Tr. at 111-114; DX 260.) Several key recommendations from this study— including implementation of passenger caps, the creation of a cruise ship committee, and observance of an annual review process—would become the foundation for how the Town regulated cruise ships in subsequent years. (7/13/23 Tr. at 111-14.)

---

[1] Citations to "Tr." are to the trial transcript, preceded by the relevant date.

In 2008, the Town accepted a recommendation from the Town's Cruise Ship Study Task Force (which also recommended the formation of a standing Cruise Ship Committee) to implement daily cruise ship passenger caps of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August. (Add. 48-49 ¶ 9.) The daily passenger caps were calculated by using the lower berth capacity of cruise vessels. (*Id.* ¶ 10.) Those caps remained in place from 2008 through 2021. (*Id.* ¶¶ 11-14.)

While the passenger caps remained static, cruise ship visitation continued to swell, as more and larger ships visited Bar Harbor. (7/13/23 Tr. at 136-37.) There were more days with ships, and more days with multiple ships. (*Id.*) Around 2017, there was discussion in the Town of a proposal to purchase the old ferry terminal property and construct a deep water berthing pier for large cruise ships. (7/13/23 Tr. at 110-12, 231-32; Plaintiffs' Exhibit ("PX") 47.) This generated intense "angst" in the Town about the level of cruise ship visitation. (7/13/23 Tr. at 112, 123-25, 231-32.) While that pier was never constructed, cruise ship visitation continued to increase. In 2019, 158 cruise ships, with a combined lower berth capacity of 249,080 passengers, called at Bar Harbor—a town of

5,500 residents. (Add. 51 ¶ 32; 7/13/23 Tr. at 169.) There was not a single day in September 2019 without a cruise ship. (7/13/23 Tr. at 136.)

The Town Council received more and more communications from the community asking them to address cruise ship visitation. (7/13/23 Tr. at 138-39.) In January 2020, the Council directed the Cruise Ship Committee to study the impacts of cruise ship visitation on residents of the Town. (7/13/23 Tr. at 138-39.) Then, COVID-19 hit. As a result of the pandemic, no foreign-flagged cruise ships were operating in 2020 or 2021. (7/13/23 Tr. at 137-38, 229.) People noticed the difference; they continued to reach out to the Council during the pandemic to express concern about cruise ships returning. (7/13/23 Tr. at 137-38, 229.)

In 2021, the Council commissioned a survey to try to better understand the concerns regarding cruise ship visitation and strategies to address them. (7/13/23 Tr. at 139; DX 323.) The Town's consultants hoped to receive 300 to 400 responses to the survey; they got 1,500. (7/13/23 Tr. at 139-40, 167-70.) A majority of the respondents expressed concern about congestion caused by cruise ship visitation. (7/13/23 Tr. at 144-45.) The survey results led the Council to conclude that cruise ship visitation should be reduced. (7/13/23 Tr. at 151-52, 170.)

On February 15, 2022, the Town Council approved the formation and membership of a working group, which, in turn, negotiated with the cruise industry for modifications of the daily passenger caps. (Add. 49 ¶ 15.) This eventually led to the execution of a Memorandum of Agreement ("MOA") with each individual cruise line in September and October of 2022. (Add. 49 ¶¶ 16-17, 19-20; 7/13/23 Tr. at 152-57; DX 327.) The MOA shortened the cruise ship season by eliminating the months of April and November, set lower daily passenger caps, and created new monthly caps. (Add. 50 ¶ 18; 7/13/23 Tr. at 152-57; DX 327.)

In March 2022 (while the Council was engaged in the process that would ultimately lead to the execution of the MOAs), a seven-member petitioning committee which included Charles Sidman submitted to the Town Council a petition proposing an amendment to the Town's Land Use Ordinance. (App. 295-300.) The proposed amendment provided: "As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor. . . ." (App. 295.) The proposed amendment further provided that the Harbor Master "shall develop rules and

regulations" to establish, among other things, a mechanism for counting the number of persons disembarking each day, and a procedure for reporting violations to the Code Enforcement Officer. (*Id.*) The proposed amendment gave enforcement authority to the Code Enforcement Officer, based on information provided by the Harbor Master, and property owners in violation were to be subject to a minimum $100 penalty per "excess unauthorized person." (*Id.*) The purpose statement submitted with the petition provides, in part:

> The purpose of this amendment to the Code is to require a permit to be issued to any property owner wishing to allow for the discharge of cruise ship passengers in the Town of Bar Harbor from their property, and to establish a codified limit on the number of passengers who may disembark from cruise ships and be transported to the Town of Bar Harbor per day. Underlying this proposed amendment is the fact that, in recent years, the Town has been a popular port of call for cruise ships of varying sizes, from which passengers disembark via tender boats that offload passengers directly into the downtown area. The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents. The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at

local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers. A town-wide survey was conducted in 2021, showing that a majority of respondents believe that the volume of disembarking cruise ship passengers is too high and has a negative impact on the Town and the health, safety and welfare of its residents.

(App. 299.) Mr. Sidman did not consider the MOA negotiated by the Council a viable alternative because the reductions were voluntary and, he believed, too modest. (7/13/23 Tr. at 273-74.)

On August 2, 2022, the Town Council voted to place the proposed amendment on the warrant for the November Town Meeting. (Add. 50 ¶ 21.) Voters approved the proposed amendment at the November 2022 Town Meeting and it became the Ordinance effective December 8, 2022. (Add. 50 ¶ 22.) The Ordinance is codified at Bar Harbor Code § 125-77(H). (Add. 45-46.) Following the adoption of the Ordinance, Town staff tasked with developing the rules implementing the Ordinance publicly and authoritatively stated in a written report delivered to the Council that the Town will not enforce the Ordinance to prohibit or cause a fine to issue for the disembarkation of persons that are recognized as "vessel personnel," "vessel crew," "seafarers assigned to a vessel," "pilots," and "representatives of seafarers' welfare and labor organizations" under 33

C.F.R. § 105.200 and 33 C.F.R. § 105.237. (7/13/23 Tr. at 73-75; PX 204.) This was to be codified as part of the regulations contemplated by the Ordinance and necessary before the Ordinance can be enforced. (7/13/23 Tr. at 161-64.)

*Procedural History*

On December 29, 2022, a group of local business interests filed this lawsuit challenging the constitutionality of the Ordinance. (App. 26-79.) Plaintiffs consist of the Association to Preserve and Protect Local Livelihoods, B.H. Piers, L.L.C., Golden Anchor, L.C., doing business as Harborside Hotel, B.H.W.W., L.L.C., Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC, and Acadia Explorer 492, LLC (collectively "APPLL"). With the exception of the Association to Preserve and Protect Local Livelihoods, a membership organization made up of certain Bar Harbor businesses, Plaintiffs are all arms of the Walsh family group of companies, Ocean Properties, founded by Tom Walsh, which together operate two piers located on West Street in Bar Harbor and related tender ships used to transport passengers from cruise ships to the piers. (7/12/23 Tr. at 59-62; Add. 48 ¶ 7.)  The pier owners are the only entities that would be subject to fines under the Ordinance. (App. 258 ¶

212.) The day after filing their Complaint, APPLL filed a motion for preliminary injunction, seeking to block the implementation of the Ordinance. (ECF 12.)

In the following weeks, Plaintiff-Intervenor Penobscot Bay and River Pilots Association (the "Pilots"), which provides pilotage services to certain cruise ships calling at Bar Harbor, intervened and filed its own Complaint against the Town (App. 80-117), and Mr. Sidman successfully intervened as a defendant. (Add. 160-67). After the Town agreed not to enforce the Ordinance during the pendency of the district court proceedings, APPLL withdrew its motion for preliminary injunction. (ECF 83.) A three-day trial was held in Bangor on July 11 through July 13, 2023.

By an Amended Order and Decision dated March 1, 2024, the district court held in favor of the Town in all respects, except that it concluded that the Ordinance was "partially preempted in relation to seafarer shore access," but was otherwise valid as to cruise ship passengers. (APPLL Add. at 2, 60-61.) APPLL and the Pilots appealed to this Court, and Mr. Sidman filed a cross-appeal. Pioneer Law Center

(PLC) and Cruise Line International Association (CLIA) have filed amici briefs in support of appellants.

## SUMMARY OF ARGUMENT

This case concerns the legality of the Town's reasonable decision to exert its home rule authority by enacting an ordinance to reduce congestion and other undesirable effects of cruise ship tourism by limiting the daily number of persons that may disembark cruise ships in Bar Harbor. Although they purport to have filed this case to fulfill the purpose and objective of Congress and to protect their remarkably unrestrained interpretation of the dormant Commerce Clause, the reality is that appellants are local businesses asking this Court to overturn the will of the people to protect their own unique and purely local economic interests. In essence, they ask this Court to give their chosen business model constitutional protection, at the expense of the people of Bar Harbor.

Neither the law nor the facts support their claims. Appellants have failed to identify any state or federal law that would apply to preempt the Town from limiting cruise ship disembarkations. Appellants have failed to demonstrate that the Ordinance, by design or by effect, discriminates

against interstate commerce or foreign commerce, or imposes a clearly excessive burden on commerce. And finally, Appellants have failed to show that the Ordinance is without any rational basis, either for purposes of a due process analysis or (unpreserved) right to travel analysis.

## ARGUMENT

APPLL and the Pilots challenge the Ordinance on the grounds that it (1) is preempted by federal law; (2) violates the dormant Commerce Clause; (3) violates substantive due process; (4) violates the constitutional right to travel; and (5) is preempted by Maine law. The Town addresses each argument in turn.

## I. Federal Law Does Not Preempt the Ordinance.

The Supremacy Clause of the U.S. Constitution states that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. There are three forms of federal preemption of state law: express preemption, conflict preemption, and field preemption. *E.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024); *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th

1, 5 (1st Cir. 2022). These three forms of preemption may be summarized as follows:

> Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute. Conflict preemption takes place when state law imposes a duty that is inconsistent—i.e., in conflict—with federal law. Field preemption comes about when federal law occupies a field of regulation so comprehensively that it has left no room for supplementary state legislation.

*Consumer Data*, 26 F.4th at 5 (quotation marks and citations omitted).

"[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Even where a federal law contains an express preemption clause, this "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

When analyzing a claim of preemption, courts start "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Lohr*, 518 U.S. at 485). "That assumption applies with particular force when Congress has

legislated in a field traditionally occupied by the States." *Altria*, 555 U.S. at 76. "[L]ocal land use restrictions for on-shore port facilities" are such a field, being "within the traditional realm of state and local police power." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 444-45 (D. Me. 2017) [*Portland Pipe Line I*]. Moreover, courts must keep in mind "the elementary rule . . . that every reasonable construction must be resorted to . . . in order to save a statute from unconstitutionality." *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005).

## A. The Ordinance Is Not Preempted By the "Federal Interest in Maritime Matters."

The Pilots suggest that Congress has occupied a sprawling field encompassing all "maritime matters," leaving nothing for the states or local governments. (Pilots Br. at 46.) This includes—but in the Pilots' expansive theory is certainly not limited to—matters of "vessel operations." (*Id.*) According to the Pilots, the Ordinance runs afoul of "federal primacy" in this area because it "directly impact[s] . . . the vessel's main function and operation." (*Id.* at 46, 52.) The argument does not hold water.

First, states and local governments retain broad authority to regulate in matters touching upon maritime commerce. "In the exercise of [police] power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960). "Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws . . . or local quarantine laws . . . or local safety inspections . . . or the local regulation of wharves and docks." *Id.* at 447. Indeed, the very existence of the Pilots as an organization—state-licensed and mandated pilots—demonstrates this principle. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 168-69, 179 (1978) (rejecting argument that local pilotage or tug escort requirements are preempted by federal vessel design standards). As the Supreme Court recognized 65 years ago,

> to claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system. But this limitation still leaves the States a wide scope. . . . Maritime law is not a monistic system. The State and Federal Governments jointly

exert regulatory powers today as they have played joint roles in the development of maritime law throughout our history.

*Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 373-74 (1959) (footnotes omitted), *superseded by statute on other grounds as recognized in Portland Pipe Line I*, 288 F. Supp. 3d at 446.

Second, the Ordinance does not regulate vessels at all. It regulates land use—that is, pier owners' use of their land to disembark cruise passengers. Regulation of on-shore facilities and conduct is where local interests are at their peak, and federal interests at their nadir. *Portland Pipe Line I*, 288 F. Supp. 3d at 447-48. The Ordinance does not dictate how cruise vessels are constructed, inspected, certified, licensed, or operated. Nor does the Ordinance dictate how many passengers a cruise ship may carry. It simply limits how many daily disembarkations pier owners in Bar Harbor may accept, in order to reduce the acute congestion problems at its waterfront and otherwise maintain residents' quality of life. To the extent this might affect how cruise vessels choose to conduct themselves—i.e., that some larger ships might choose not to call at Bar Harbor if their entire complement of passengers cannot disembark on a given day—that is the normal and expected effect of a coastal jurisdiction regulating conduct within its boundaries:

There is a federal interest in the flow of maritime commerce, but [Plaintiff] does not cite any cases suggesting this has ever given vessels unrestricted access to any stretch of shoreline for any purpose they wish. Any ban on goods or conduct within a coastal jurisdiction will affect maritime vessels by prohibiting them from unloading or loading that good or participating in that conduct while docked. But this broad an interpretation of maritime preemption . . . would "push the line shoreward" and "engulf everything" historically left to coastal jurisdictions.

*Id.* at 448 (quoting *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 344 (1973)).

The two cases on which the Pilots primarily rely—*United States v. Locke*, 529 U.S. 89 (2000), and *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)—are readily distinguishable. Both involved preemption by a specific federal statute, the Port and Waterways Safety Act, which the Pilots admit does not apply here. In both cases, the Court engaged in a careful examination of the statutory language and history to determine whether a specific conflict existed or whether Congress clearly intended to preclude state laws in the same field—there, the design, construction, and operation of tankers. *See, e.g.*, *Locke*, 529 U.S. at 111-12; *Ray*, 435 U.S. at 163-65. Neither case supports the Pilots' overbroad theory of blanket maritime field preemption. Indeed, *Ray* expressly and repeatedly recognized the authority of states and municipalities in maritime

matters. *See Ray*, 435 U.S. at 164 ("[T]he mere fact that a vessel has been inspected and found to comply with [federal] vessel safety regulations does not prevent a State or city from enforcing local laws having other purposes."); *id.* at 168-69 ("[T]hat a tanker is certified under federal law as a safe vessel insofar as its design and construction characteristics are concerned does not mean that it is free to ignore otherwise valid state or federal rules or regulations that do not constitute design or construction specifications.")

The Pilots fail to even attempt the kind of focused analysis applied in *Locke* or *Ray*, instead gesturing vaguely in the direction of a mishmash of federal provisions, some never argued in the district court.[2] None of these scattershot provisions bear any apparent relation to the Ordinance at issue, which, contrary to the Pilots' contentions, does not attempt to dictate how many passengers cruise vessels may carry. Nothing in this federal soup suggests any intent on the part of Congress to occupy the field of regulating local piers.

---

[2] While APPLL and the Pilots referenced a grab bag of treaties in their respective complaints (App. 46, 103), by the time of trial, they had abandoned any such arguments, and did not reference them at all in their post-trial briefs (Pilots Post-Trial Br., ECF 190; APPLL Post-Trial Br., ECF 191).

## B. The Ordinance Does Not Conflict With Federal Laws Regarding Customs and Immigration Screening.

APPLL and the Pilots argue that the Ordinance is also preempted due to conflict with federal customs and immigration laws. Neither APPLL nor the Pilots cite any actual provision of federal law supposedly in conflict with the Ordinance. That is because no such conflict exists. Contrary to APPLL and the Pilots' contentions, nothing in the Ordinance imposes anything resembling an additional "condition of entry" on immigrants seeking to enter the United States.

The Ordinance does not, and could not, prohibit entry into the U.S. It merely sets limits on the number of passengers of cruise ships—regardless of the origin of either the passengers or the ships—that may disembark in Bar Harbor on a particular day. Nothing in the Ordinance prevents cruise ships, of any size or origin, from anchoring in Frenchman Bay. (PX 195 at 110-11; 7/13/23 Tr. at 24-26.) Nothing in the Ordinance prevents Customs and Border Protection from boarding those ships and screening passengers for entry into the U.S. (7/11/23 Tr. at 107:14-25.) Anyone screened and admitted may disembark in Bar Harbor or anywhere else in the country, including but not limited to any of the two other Class A ports in Maine. (PX 195 at 20, 111; ECF 137 ¶¶ 24, 26, 28.)

The pier owners simply face penalties if they permit more than 1,000 daily disembarkations in Bar Harbor. It is in no way "impossible" to comply with both federal customs and immigration screening and the Ordinance, and the Ordinance stands as no obstacle to the screening process's purpose of preventing illegal entry into the U.S.[3]

As discussed in greater detail with respect to the Commerce Clause analysis, *see infra* Part II.A, the Ordinance does not discriminate on the basis of the origin of ships or their passengers, rendering the few cases cited by APPLL and the Pilots wholly inapposite. *See Takahashi v. Fish & Game Com.*, 334 U.S. 410, 419 (1948) ("State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held

---

[3] As the district court observed, the notion the "1,001st" passenger being denied entry to Bar Harbor (much less the United States) is complete fantasy. First, the Ordinance does not prohibit, nor authorize any Town official to prohibit, any passenger from disembarking. It simply imposes a fine on pier owners for each excess disembarkation over 1,000 on a given day. Second, cruise visitation in Bar Harbor is arranged many months, if not years in advance, based on daily passenger caps that predate the Ordinance. If, as APPLL and the Pilots assure us, larger ships will choose not to call at Bar Harbor due to the new cap imposed by the Ordinance, the "1,001st" passenger scenario will never occur.

invalid."); *Toll v. Moreno*, 458 U.S. 1, 28 (1982) (quoting same language)

*Graham v. Richardson*, 403 U.S. 365, 378 (1971) (same); *Me. Forest*

*Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 38-39 (D. Me. 2022)

(same).[4]

### C. The Ordinance Does Not Conflict With Federal Laws Designating Anchorages.

Finally, the Pilots suggest that the Ordinance is preempted by the

Coast Guard's designation of anchorage grounds in Frenchman Bay. The

regulations of 33 C.F.R. Chapter I, Subchapter I, Parts 109-110—which

do not state that they have preemptive effect over local regulations—

---

[4] CLIA also argues that the Ordinance is preempted by the Convention on Facilitation of International Maritime Traffic ("FAL Convention"). (CLIA Br. at 25-27.) This argument, first raised by an amicus in this Court, is not preserved for this Court's review. As discussed above, APPLL and the Pilots abandoned any argument based on the various treaties referenced in their complaints. *See supra* note 2. More importantly, the FAL Convention was not among the treaties *ever* referenced in the district court. On appeal, the Pilots reference it only in passing, in a footnote listing various treaties (Pilots Br. at 55 n. 49), and APPLL does not reference it at all. This argument is therefore waived. *See, e.g.*, *United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."). Even if this argument were not waived, it is without merit. By their own terms, most of the provisions CLIA cites are "recommended practices," not legal requirements, and CLIA fails to explain how the Ordinance conflicts with any of them. This argument fails for the same reasons as the Pilots' customs and immigration argument.

describe various "anchorage grounds" for vessels in navigable waters of the United States. These regulations do not require that any vessel come to any of the waters specified in Subchapter I, nor contemplate that the designation of anchorage grounds somehow displaces local laws. 33 C.F.R. § 110.130 provides the locations of anchorage areas for Frenchman Bay, Bar Harbor, and specifies that the anchoring of vessels there "is under the coordination of the local Harbormaster." No provision in Subchapter I would or could be frustrated by not having more than 1,000 persons per day going into Bar Harbor from cruise ships anchored in Frenchman Bay.

If fewer large cruise ships choose to visit Bar Harbor due to the Ordinance, that would not mean that the Town has somehow prohibited or made it "impracticable" for such vessels to use the anchorages. The Ordinance governs *disembarkation* on land, not anchorage in Frenchman Bay. Nothing in the Ordinance prohibits large ships—or any ships, for that matter—from using the anchorages. All vessels remain as free to use the anchorages as they ever have.[5] That some of these vessels might, as

---

[5] The Pilots suggest that the Town is "conditioning use of the anchorages on compliance with the Ordinance's disembarkation limit" via "a long-standing, voluntary reservation system for the anchorages." (Pilots Br.

a matter of business judgment, decide not to call at Bar Harbor if they cannot disembark their full passenger capacity does not interfere with the Coast Guard's designation of the anchorages for use by vessels who do wish to make use of them.

### D.  The Seafarer Shore Access Issue Is Moot.

Before leaving the topic of preemption, the Town must address APPLL's rather perfunctory argument that the district court, having found that the Ordinance had the "potential" to conflict with 33 C.F.R. § 105.237 if applied in a manner that restricted seafarers' shore access (APPLL Add. 31-32),[6] erred in not striking down the Ordinance in full

---

at 61.) The Pilots conspicuously cite no record support for this proposition. That is because there is no such support. The Town's reservation system was not imposed by the Ordinance, and in fact predates the Ordinance by 15 years. (APPLL Add. at 7-8.) That reservation system has been a cornerstone of cruise tourism in Bar Harbor, the need for which has long been recognized by all parties, "with the understanding that a free-for-all would result in chaos and passenger dissatisfaction with the shoreside experience." (APPLL Add. at 28 n.18.) The reservation system was not challenged in this lawsuit, and is not at issue.

[6] Mr. Sidman has cross-appealed the district court's preemption ruling as to seafarer shore access. Because the Town has never had any intention of applying the Ordinance to seafarers, and because the issue would become moot upon the Town's adoption of rules implementing the Ordinance, it did not cross-appeal.

and granting them a "comprehensive" injunction. (APPLL Br. 46-48.) Not so.

First, any issue regarding potential application of the Ordinance to seafarers is now moot. The federal judicial power is limited to "cases" and "controversies." U.S. Const. art. III, § 2; *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). There is "no case or controversy, and a suit becomes moot, when the issues presented are no longer 'live.'" *Chafin*, 568 U.S. at 172 (quotation marks omitted). The "case-or-controversy" requirement persists on appeal, *id.*, and post-judgment developments may render a case or issue moot on appeal, *see, e.g.*, *United States v. Morales-Vélez*, 100 F.4th 334, 347-48 (1st Cir. 2024).

Effective July 18, 2024, the Town adopted Chapter 52 of the Bar Harbor Code, which, by its terms, implements the Ordinance. (Add. 42-44.)[7] Section 52-5 of the Code expressly excludes seafarers from the application of the Ordinance. (Add. 42-43 § 52-5.) Where the Town has—

---

[7] This implementing ordinance was not in effect at the time of trial, and therefore was not before the district court. However, the Town is obligated to bring to the Court's attention facts bearing on questions of jurisdiction and justiciability. *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23 (1997); *Solze v. Shinseki*, 26 Vet. App. 299, 301 (2013).

as it consistently made clear it would—foreclosed any hypothetical possibility of enforcement against seafarers, this issue is no longer "live."

Second, even if the seafarer issue remained live, APPLL is simply wrong on the law. A "statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)). The default rule is that "partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.* (cleaned up) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" *Id.* at 330.

The inquiry here is whether the voters would have intended the Ordinance to apply as against passengers even if it could not be applied to crew. *See Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶ 16, 187 A.3d 609, 618 ("Interpreting citizen-enacted legislation requires us to 'ascertain the will of the people' rather than the will of the Legislature." (quoting *Op. of the Justices*, 2017 ME 100, ¶ 7, 162 A.3d 188, 198)). The

district court properly found that "the voters of Bar Harbor intended and would prefer that the Ordinance remain operative as to passengers rather than be invalidated as to passengers." (APPLL Add. at 31.) The record amply supports that finding.

The Ordinance was intended to address the large numbers of people "overwhelm[ing] the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents." (APPLL Add. at 12.) The voters who testified at trial framed their concerns about cruise ship visitation and the basis for their votes in favor of the Ordinance in terms of "passengers." (7/13/23 Tr. at 214-15, 234, 237.) Plainly, the primary purpose of the Ordinance was to limit *passenger* disembarkation, consistent with the Town's history of managing cruise ship visitation. It strains credulity to suggest that voters would prefer no restriction of cruise ship disembarkations at all to restriction of "only" the vast majority of them.

**II.  The Ordinance Does Not Violate the Dormant Commerce Clause.**

The Commerce Clause, in addition to establishing the power of Congress "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, has also been interpreted to limit the regulatory power of the states, *see, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996). The so-called "dormant Commerce Clause" prohibits states from adopting "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Fulton Corp.*, 516 U.S. at 330 (quotation marks omitted).

The dormant Commerce Clause's limitation on state and local power is far from absolute. "In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Lewis v. Bt Inv. Managers*, 447 U.S. 27, 36 (1980) (quotation marks omitted).  As the Supreme Court stated almost forty years ago:

> The Commerce Clause . . . *does not elevate free trade above all other values.* As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of

economic isolation, it retains broad regulatory authority to
protect the health and safety of its citizens and the integrity
of its natural resources.

*Maine v. Taylor,* 477 U.S. 131, 151 (1986) (emphasis added) (citation and

quotation marks omitted). The Supreme Court recently reaffirmed this

principle, and expressed an even narrower understanding of the role of

the dormant Commerce Clause in our federalist system of democracy:

> [T]he Framers equipped Congress with considerable power to
> regulate interstate commerce and preempt contrary state
> laws. In the years since, this Court has inferred an additional
> judicially enforceable rule against certain, especially
> discriminatory, state laws adopted even against the backdrop
> of congressional silence. But *extreme caution is warranted
> before a court deploys this implied authority.* Preventing state
> officials from enforcing a democratically adopted state law in
> the name of the dormant Commerce Clause is a matter of
> extreme delicacy, something courts should do only where the
> infraction is clear.

*Nat'l Pork Producers*, 598 U.S. at 390 (emphasis added) (cleaned up).

Modern dormant Commerce Clause jurisprudence rests on two

primary principles. "First, state regulations may not discriminate

against interstate commerce; and second, States may not impose undue

burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 585 U.S.

162, 173 (2018). "Discrimination," in this context, means "economic

protectionism—that is, regulatory measures designed to benefit in-state

economic interests by burdening out-of-state competitors." *Id.* (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008)); *see also Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264, 299 (D. Me. 2018) [*Portland Pipe Line II*] ("'Discrimination' in this context simply means differential treatment of instate and out-of-state economic interests that benefits the former and burdens the latter." (quotation marks omitted)). If a law discriminates against out-of-state goods or interests, it is unconstitutional unless it is narrowly tailored to advance a "legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 185 (1st Cir. 1999).

A plaintiff challenging a law bears the burden of demonstrating that it discriminates against interstate commerce. *Gwadosky*, 430 F.3d at 40. "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (footnote omitted). In order to show discrimination, then, a plaintiff must "identify an in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Selevan v. N.Y. Thruway*

*Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) (quotation marks and alterations omitted). This is because "laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007) (citing *Tracy*, 519 U.S. at 300). "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Tracy*, 519 U.S. at 300. If discrimination is shown, the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects, and that there was no nondiscriminatory alternative by which it could protect those benefits. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

If the plaintiff cannot prove discrimination—that is, if the law is facially neutral and regulates in-state and out-of-state interests evenhandedly, with only incidental effects on interstate commerce—the law will be upheld unless the plaintiff shows that "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative

local benefits." *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This standard derives from the Supreme Court's decision in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, and has been considerably narrowed in recent years, as discussed below. *See infra* Part II.B.

## A. The Ordinance Does Not Discriminate Against Interstate or Foreign Commerce.

There are three ways that a law may be deemed to be discriminatory: (1) it is discriminatory on its face (i.e., it imposes restrictions on out-of-state businesses but not local competitors); (2) it is facially neutral but discriminates in effect (i.e., it conveys a competitive advantage on local businesses with respect to out-of-state competitors); or (3) it is facially neutral but has a discriminatory purpose (i.e., the legislative history of the law shows that it was intended to benefit local businesses over out-of-state interests). *Town of Southold*, 477 F.3d at 48-49; *see also Gwadosky*, 430 F.3d at 35 (noting a statute may discriminate against interstate commerce "on its face, in purpose, or in effect").

### 1. The Ordinance Is Facially Neutral.

Any suggestion of facial discrimination in this case can be swiftly rejected. On its face, the Ordinance does not distinguish between in-state

and out-of-state interests. The Ordinance applies to all cruise ships, regardless of their origin or destination. It draws no distinctions based on the origin of the passengers or crew aboard the ships, the flag the ship flies, or whether the cruise line in question is foreign or domestic. It applies with equal force to all cruise ships. This is the very definition of a facially neutral law. *See Portland Pipe Line II*, 332 F. Supp. 3d at 300 (holding ordinance that did not mention "source, destination, or residency" was facially neutral).

## 2. The Ordinance Does Not Discriminate in Effect.

The Pilots[8] claim that the Ordinance discriminates in effect fails for the simple reason that they have not shown that the Ordinance protects in-state interests from out-of-state competition. "In the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Portland Pipe Line II*, 332 F. Supp. 3d at 300 (quoting *Tracy*, 519 U.S. at

---

[8] APPLL appears to have abandoned any argument that the Ordinance discriminates in favor of local interests.

300). "[I]f local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause." *Houlton Citizens' Coal.*, 175 F.3d at 188.

The Ordinance operates equally on all cruise ship disembarkations within the Town, leaving all with equal access. There are no in-state cruise lines. When there are no direct in-state competitors to be relatively advantaged, there can be no discrimination of the type that the dormant Commerce Clause prohibits (i.e., economic protectionism). *Portland Pipe Line II*, 332 F. Supp. 3d at 300-01 ("[W]hen there are no direct competitors to suffer a relative disadvantage from the supposedly protectionist state law, there is no risk of the kind of economic protectionism that the dormant Commerce Clause prohibits."); *All. of Auto. Mfrs. v. Gwadosky*, 304 F. Supp. 2d 104, 113 (D. Me. 2004) (holding that a state law relating to automobile manufacturing could not "discriminate against out-of-state manufacturers, because as a matter of fact, there are no in-state manufacturers to be favored").

If anything, the Ordinance burdens in-state economic interests, i.e., the interests of APPLL and the Pilots (if their cataclysmic forecasts hold water), while having no discernible impact one way or the other on out-

of-state interests. The fact remains that pursuant to the Ordinance, cruise ships can still come to Bar Harbor if they desire, or if they do not want to, they can just go somewhere else. An ordinance "cannot be said to favor in-state commercial interests at the expense of out-of-state competitors when the entities most directly harmed by the practical effects of the [o]rdinance are in-state, local businesses." *Portland Pipe Line II*, 332 F. Supp. 3d at 301.

The real complaint in this case is that cruise lines whose preferred business model involves mega-ships might choose not to come to Bar Harbor if they cannot disembark their entire complement of passengers in a single day, and that, in turn, might reduce revenues flowing to APPLL and the Pilots. But neither the cruise lines nor the local interests that have cast their lot with the cruise lines are entitled to constitutional protection of their business model. The dormant Commerce Clause prohibits protectionism—it does not protect particular interstate firms or their chosen "methods of operation" from regulation. *Nat'l Pork Producers*, 598 U.S. at 384; *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978). The elimination of efficiencies for one group of out-of-state operators compared to another group of out-of-state operators is not

protectionist, and has repeatedly been rejected as the basis for a dormant Commerce Clause challenge. *Nat'l Pork Producers*, 598 U.S. at 385; *Exxon*, 437 U.S. at 127. Any harm to the profits of cruise lines or their local partners is not harm to *commerce*.

The Pilots cast the Ordinance as favoring local hotels over out-of-state cruise ships. But a visit to Bar Harbor for a few hours (or less) as part of a seven- or fourteen-day cruise up and down the eastern seaboard (PX 195 at 17) is not at all comparable to an overnight trip to Bar Harbor requiring a hotel stay. And of course, a visitor who comes to Bar Harbor by other means cannot simply "book" an overnight stay on a cruise ship— which typically do not remain in Bar Harbor overnight in any event. (7/12/23 Tr. at 107-08, 186, 198-99; 7/13/23 Tr. at 16-17, 239; Add. 48 ¶ 6.) These are different products for different types of visitors to Bar Harbor with different needs and priorities. This argument regarding supposed favoritism towards local hotels is also undercut by the fact that the business interests bringing this very lawsuit are just as "local" as hotels—indeed, the Walsh family which owns much of APPLL also owns a number of hotels, including in Bar Harbor. (7/12/23 Tr. at 60, 62-68, 75-76.)

Really, APPLL and Pilots' complaint is that the Ordinance supposedly favors "land-based" tourism over cruise ship tourism. (APPLL Br. at 46 & n.27). But visitors to Bar Harbor by means other than cruise ships do not pose the same congestion problems that the Ordinance is intended to address, because they do not arrive in Bar Harbor in the same highly concentrated manner, both temporally and spatially. (7/13/23 Tr. at 237-39, 265.) It is entirely appropriate for the Town to treat cruise ship disembarkations differently based on their distinguishing characteristics. *See Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978) (noting dormant Commerce Clause permits disparate treatment of articles of commerce if "there is some reason, apart from their origin, to treat them differently"). To the extent that the Ordinance does not tackle any negative effects of "land-based" visitation, the Supreme Court "has made clear that a legislature need not strike at all evils at the same time or in the same way, and that a legislature may implement its program step by step, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (cleaned up). Moreover, the Town has a number of initiatives that

seek to address negative effects of "land-based" tourism, including paid parking, limitations on short-term vacation rentals, public transportation, and improving sidewalks and walking paths. (7/13/23 Tr. at 67-71, 81-83, 100-01, 164-67, 232.)

### 3. The Ordinance Has a Non-Discriminatory Purpose.

Courts have expressed skepticism that a law that does not have a discriminatory effect could nevertheless violate the dormant Commerce Clause through discriminatory purpose alone. *See, e.g.*, *Gwadosky*, 430 F.3d at 36 n.3 ("While courts routinely recite this test, there is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause."); *Portland Pipe Line II*, 332 F. Supp. 3d at 300 (noting argument that an ordinance intended to discriminate is "largely undercut" if its "practical effect is not to discriminate"). Where the Ordinance does not discriminate either on its face or in effect, it is questionable whether even an overt discriminatory purpose would pose a dormant Commerce Clause problem.

Thankfully, the Court need not answer this question, because the Ordinance is non-discriminatory in its purpose. The Ordinance's

statement of purpose cites problems of congestion, increased demands of services, and general degradation of quality of life. (App. 299.) It does not advert in any way to the origin of the ships or their passengers or crew, or any other matter that could plausibly be linked to economic protectionism. The Ordinance was the culmination of a political process that played out over many years in which the residents of Bar Harbor came to the collective determination that cruise ship visitation had ballooned to a point at which the large numbers of passengers disembarking in downtown Bar Harbor was creating congestion problems and otherwise negatively affecting their quality of life. (7/13/23 Tr. at 111-22, 136-39.) This causal relationship was brought into clear focus during the COVID-19 pandemic, when there were two years of no cruise ships. (7/13/23 Tr. at 137-38, 229.) Residents increasingly conveyed to the Council that they felt excessive cruise ship disembarkations made Bar Harbor a worse place to live and work, including by a survey that garnered some 1,500 responses—more than one-fourth Town's total population. (7/13/23 Tr. at 138-45, 167-70; App. 305-22.) That survey is explicitly mentioned in the Ordinance's purpose section. (7/13/23 Tr. at 271.) Several residents of the Town testified that they voted for the

Ordinance for exactly these reasons. (7/13/23 Tr. at 212-16, 218-22, 224-39.)

APPLL contends that certain statements of Mr. Sidman reveal that the "real purpose" of the Ordinance was to keep ships with passenger capacity over 1,000 out of Bar Harbor. (APPLL Br. at 44 & n.25, 53.) There are several problems with this argument. First, Mr. Sidman's statements as one member of a petitioning committee are of dubious probative value as to the intent of the *entire electorate of Bar Harbor* in passing the Ordinance.[9] *See, e.g.*, *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 14 n.4 (1st Cir. 2010) (noting that while remarks of individual legislators "are evidence," they "[c]learly . . . are not controlling and do not compel any conclusion that the remarks reflect legislative intent"); *Portland Pipe Line II*, 332 F. Supp. 3d at 303 ("'Statements by a law's private-sector proponents sometimes can shed light on its purpose' but the isolated correspondence of a single proponent 'has little (if any)

_____

[9] "Interpreting citizen-enacted legislation requires [courts] to 'ascertain the will of the people' rather than the will of the Legislature." *Wawenock*, 2018 ME 83, ¶ 16, 187 A.3d 609, 618 (quoting *Op. of the Justices*, 2017 ME 100, ¶ 7, 162 A.3d 188, 198.)

probative value in demonstrating the objective of the legislative body as a whole.'" (quoting *Gwadosky*, 430 F.3d at 39)).

Second, nothing in Mr. Sidman's statements contains any hint of the type of protectionist discrimination that might run afoul of the dormant Commerce Clause. Rather, his statements uniformly show a concern with the negative effects of large numbers of passengers disembarking from cruise ships on a single day. In its post-trial brief in the district court, APPLL sought to read discriminatory purpose into the Ordinance by conflating Mr. Sidman's references to "big" ships with "foreign" ships, and his references to "small" ships with "local" ships. (ECF 191 at 36 (citing PX 72, DX 357); APPLL Add. 80.) But, of course, "big" is not "foreign," and "small" is not "local," and the Ordinance applies to all cruise ships, big or small, local or foreign.

**B.   The Ordinance Does Not Impose a "Clearly Excessive" Burden on Interstate or Foreign Commerce in Relation to its Local Benefits.**

When a law does not facially discriminate, or have the purpose or effect of favoring local economic interests over foreign or out-of-state interests, it is upheld unless the burdens on foreign or out-of-state interests are clearly excessive in relation to the putative local benefits.

*See Portland Pipe Line II*, 332 F.Supp.3d at 308 (citing *Pike*, 397 U.S. at 142.) State and local laws "frequently survive this *Pike* scrutiny." *Id.* (quoting *Davis*, 553 U.S. at 339).

The Supreme Court's recent discussion of *Pike* in *National Pork Producers* is instructive. The Court noted that, although a genuinely nondiscriminatory state law might theoretically be invalid under *Pike*, there is "no clear line" separating *Pike* and the Court's antidiscrimination precedents. 598 U.S. at 377 (quoting *Tracy*, 519 U.S. at 298 n.12). Indeed, *Pike* itself turned on the existence of discrimination—although the law in that case was facially neutral, its practical effects revealed the discriminatory purpose of insulating in-state cantaloupe processing and packaging businesses from out-of-state competition by requiring cantaloupes grown in the state to be processed and packaged in state. *Id.* at 377-78 (citing *Pike*, 397 U.S. at 138-40, 145-46). *Pike*'s "heartland" lies in the same anti-protectionist principles underlying the balance of the Court's dormant Commerce Clause jurisprudence; *Pike* merely "serves as

an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.* at 377-80.[10]

The Court further held that, before *Pike* balancing is even required, the plaintiff must first show a "substantial burden" on interstate commerce. *Id.* at 383-87 (plurality opinion of Justice Gorsuch as to Part IV-C, joined by Justices Thomas, Sotomayor, and Kagan); *see also id.* at 403 (Kavanagh, J., concurring in part and dissenting in part) (recognizing that four-justice plurality opinion in Part IV-C is "controlling precedent"). The California law challenged in *National Pork Producers*, Proposition 12, prohibited in-state sale of pork from pigs "confined in a cruel manner" that prevented them from lying down, standing up, extending their limbs, or turning around. *Id.* at 365-66. The plaintiffs—organizations representing pig farmers and processors—alleged that Proposition 12 would require sweeping changes to the

---

[10] Three justices were prepared to do away with *Pike* balancing completely, leaving only the antidiscrimination principle. *See Nat'l Pork Producers*, 598 U.S. at 380-83, 387-89 (plurality opinion of Justice Gorsuch with respect to Parts IV-B and IV-D, joined by Justices Thomas and Barrett); *see also id.* at 403 (Kavanagh, J., concurring in part and dissenting in part) (recognizing that Justice Gorsuch's opinion in Parts IV-B and IV-D, joined by Justices Thomas and Barrett, would overrule *Pike*).

vertically integrated pork production industry in order to segregate and trace pork that complied with California law. *Id.* at 384-85. The Court held that plaintiffs had failed to allege substantial harm to interstate commerce, and therefore did not even reach *Pike* balancing. *Id.* at 383-87. The Court noted that pork producers had a choice: "They may provide all their pigs the space the law requires; they may segregate operations to ensure pork products entering California meet its standards; or they may withdraw from that State's market." *Id.* at 384. Even though that choice primarily fell on out-of-state businesses, this was not a substantial burden on interstate commerce, but rather a burden on a "particular structure or method of operation" that the dormant Commerce Clause does not protect. *Id.* at 385 (alteration omitted) (quoting *Exxon*, 437 U.S. at 127). Market share shifting from "one group of profit-seeking, out-of-state businesses (farmers who stringently confine pigs and processors who decline to segregate their products)" to another "who raise and trace Proposition 12-compliant pork" did not offend the Constitution. *Id.*

Similarly, *Exxon Corp. v. Governor of Maryland* involved a Maryland law prohibiting petroleum producers from operating retail gas stations in the state. 437 U.S. at 119-21. Because Maryland had no in-

state petroleum producers, the law's "divestiture requirements" fell "solely on interstate companies," and threatened to force some of them to withdraw entirely from the state. *Id.* at 125-27. The plaintiffs claimed that the law thereby interfered with the natural functioning of the interstate market and would change the market structure by weakening independent refiners. *Id.* at 127. The Court found this insufficient as a matter of law to demonstrate a substantial burden on interstate commerce. The "burden" was not on commerce, but on their particular business model, and the dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Id.* "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* at 127.

Like the plaintiffs in *Exxon* and *National Pork Producers*, APPLL and Pilots have not shown any burden on interstate commerce, much less a substantial one. APPLL and the Pilots, having failed to show the type of protectionist discrimination that is *Pike*'s "heartland," allege a number of supposed deleterious effects the Ordinance will have on the bottom line of some cruise lines and their own local businesses. But again, the

dormant Commerce Clause does not protect "the particular structure or method of operation" of the cruise industry. *Nat'l Pork Producers*, 598 U.S. at 385 (alteration omitted) (quoting *Exxon*, 437 U.S. at 127). Rather, it defends against laws that create local preferences. Under the Ordinance, all cruise lines retain equal access to the local market, no matter their origin. *See Houlton*, 175 F.3d at 188.

Because no substantial burden on interstate commerce has been shown, the Court need not reach the question of the Ordinance's local benefits for purposes of *Pike* balancing. But the Ordinance has a number of clear local benefits. Town Council Chair Valerie Peacock testified to the long history of concerns regarding ballooning cruise ship visitation, as well as different approaches the Town has taken to try to address the problem, including voluntary passenger caps. (7/13/23 Tr. at 111-26, 136-57, 167-76). Over fifteen years ago, the Town's 2007 Comprehensive Plan recognized problems associated with cruise ship visitation, including congestion, water quality, and changes in the character of the Town making it a less desirable place to live and work. (DX 250A at 77, 85, 217-21, 344, 346, 351, 368-70, 396-97; 7/13/23 Tr. at 115-18). Over time, more and more ships began to call at Bar Harbor, and the ships got larger and

larger. (7/13/23 Tr. at 136-37.) There were more days with ships, and more days with multiple ships, to the point where, in September 2019, there was not a single day without a ship. (*Id.*) In recent years, surveys of residents showed that most people were concerned about congestion due to cruise ship disembarkations. (7/13/23 Tr. at 139-45; App. 305-22.) APPLL and the Pilots' own expert, Dr. Todd Gabe, testified that cruise passengers increase sidewalk congestion.[11] (7/12/23 at 250; DX 319, 402; APPLL Add. 79; Pilots Add. 183-92.) Indeed, the Pilots admitted in their post-trial brief in the district court that the Ordinance will achieve "reduction in passenger traffic at the piers themselves or in the near proximity to the piers." (ECF 190 at 41.)

APPLL and the Pilots quibble with the magnitude of these benefits, or dismiss them as "subjective," but cite no authority that local laws must have economic or easily quantifiable benefits to survive *Pike* scrutiny. Indeed, state and local laws can be upheld based on noneconomic

---

[11] The Pilots suggest the district court's assessment of Dr. Gabe's study as not "helpful" was clear error, yet fail to identify what useful information the court should have gleaned from it. (Pilots Br. at 33.) The district court's weighing of the evidence is entitled to deference. *E.g.*, *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir. 1990).

considerations like quality of life, aesthetics, or morality, even when those concerns may be "somewhat overstated" but "sincere." *Portland Pipe Line II*, 332 F. Supp. 3d at 310-12 (upholding ban on crude oil loading on waterfront where municipality had "sincere concerns" about air quality, aesthetics, and effects on waterfront redevelopment goals); *see also Nat'l Pork Producers*, 598 U.S. at 381 (noting difficulty of balancing economic burdens of animal cruelty law against noneconomic benefit of promoting animal welfare).

Ultimately, APPLL and the Pilots' contentions amount to little more than a policy disagreement that is best left to the legislative process rather than circumventing that process by judicial fiat. If business interests, including those that brought this lawsuit, as well as the cruise lines themselves, take issue with the Ordinance, they can avail themselves of those processes at the local, state, and federal levels. The dormant Commerce Clause is not a substitute for a democratic policymaking process—rather it is a tool to be deployed with "extreme caution" and "extreme delicacy," against "especially discriminatory" laws, and "only where the infraction is clear." *Nat'l Pork Producers*, 598 U.S. at 390 (quotation marks omitted). If the Ordinance really does threaten

some massive disruption of the cruise industry, the industry is free to petition Congress to intervene under the "wakeful" Commerce Clause. *Id.* at 382-83.

The Ordinance does not discriminate against foreign or out-of-state business interests, and it provides a better quality of life and a more enjoyable experience for persons living, working, and visiting Bar Harbor. Appellants' Commerce Clause challenges fail, therefore, because even if these local lifestyle benefits from the Ordinance are difficult to quantify, the Ordinance imposes no demonstrated burden on foreign and interstate commerce, let alone one that is "clearly excessive" in relation to them. The burden of which APPLL and the Pilots complain is only the burden on their local business interests and preferred methods of doing business, not a burden on interstate commerce.

## C. The Ordinance Does Not Regulate "Instrumentalities" of Interstate Commerce or Unduly Impede the "Flow of Commerce."

Seeking to avoid engaging with modern Commerce Clause jurisprudence discussed above, APPLL and the Pilots seek to cast the Ordinance as a regulation on the "instrumentalities," "arteries," or "flow" of commerce, relying on all manner of 19th century precedents they

perceive as imposing a heightened standard more favorable to their case. (APPLL Br. at 23; Pilots Br. at 15-16.) Unfortunately for appellants, the law has evolved since the late 1800s.

The Supreme Court has made clear that, after two centuries of development, "[m]odern precedents rest upon two primary principles that mark the boundaries of State's authority to regulate interstate commerce. First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Wayfair*, 585 U.S. at 173. To the extent there was daylight between the Court's developmental "free flow" cases and its modern approach set out in *Wayfair*, any such distinction has collapsed. Justice Gorsuch's three-justice opinion in Part IV-B of *National Pork Producers* recognized that the Court's cases relating to "instrumentalities of interstate transportation" are "associated with [the *Pike*] line." 598 U.S. at 380. Chief Justice Roberts's four-justice concurrence similarly recognized that *Pike* applies broadly, including to regulations on the "instrumentalities of interstate transportation." *Id.* at 395-96 (Roberts, C.J., concurring in part and dissenting in part). Likewise, Justice Sotomayor's two-justice concurrence recognized cases addressing

burdens on the "arteries of commerce" as part of the Court's "*Pike* line." *Id.* at 392 (Sotomayor, J., concurring in part). Thus, the entire Court recognizes that the "free flow" cases on which appellants rely have been subsumed by *Pike*.

Contrary to appellants' contentions, a finding that a law in some way impedes the "flow" of commerce does not mean that the law is invalid—even before *Pike*. Rather, the burden on commerce must always be weighed against the local benefits. *See, e.g.*, *S. Pac. Co.*, 325 U.S. at 767 ("When the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority.")

The Court's pre-*Pike* line of cases regarding regulations on trucks, trains, and the like—relied on by appellants—illustrates the principle. In *Bibb v. Navajo Freight Lines*, the state law at issue required contoured mud flaps for trucks and trailers that were different than the straight flaps required by surrounding states. 359 U.S. 520, 529-30 (1959). Compliance with both states' rules was impossible, requiring operators

to change mudguards at the border, a process which took two to four hours and could be dangerous, depending on their cargo. *Id.* at 523, 527. Moreover, it was "conclusively shown" that the contoured flap "possesse[d] no advantages over the conventional or straight mud flap . . . required in most of the states," and in fact there was "convincing" evidence that the contoured flaps were actually less safe than straight flaps. *Id.* at 525. The Court held that the nonexistent (or even counterproductive) safety benefits of the state law could not justify the "heavy burden" on interstate commerce caused by the state law. *Id.* at 530-31.

Similarly, in *South Pacific Co. v. Arizona ex rel. Sullivan*, Arizona imposed restrictions on the length of trains that drastically reduced the number of train cars that could be connected compared to other states (in some cases, more than halving the length at which trains were typically operated). 325 U.S. 761, 763, 771 (1945). Compliance with the law, then, "require[d] interstate trains of a length lawful in other states to be broken up and reconstituted" as they entered and exited Arizona. *Id.* at 773. As in *Bibb*, although purportedly a safety measure, the law actually made trains more dangerous, increasing the number and severity of accidents

because it resulted in an increased number of trains. *Id.* at 775-79. In light of its heavy burden on interstate commerce and nonexistent (or even deleterious) effect on safety, the Court struck down the law. *Id.* at 783-84.

These cases, although pre-dating *Pike*, engaged in the same balancing that *Pike* later formalized. *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443 (1978) (noting that *Bibb* "stat[ed] the test to be applied to state highway regulation in terms similar in principle to the subsequent formulation in *Pike*"). The state laws in *Bibb* and *Sullivan* were not invalidated based on some heightened, overarching protection of the "flow" of commerce, but because those laws heavily burdened commerce while also actively harming public safety. *Bibb*, 359 U.S. at 530-31; *Sullivan*, 325 U.S. at 783-84.

Unlike the laws in *Bibb* and *Sullivan*, the Ordinance here does not dictate how cruise ships are to be constructed, equipped, or operated. The Ordinance does not stop cruise ships as they pass through Bar Harbor's local waters and compel them to change their configuration or reduce the number of passengers they are carrying. Indeed, the Ordinance does not regulate cruise ships at all. Rather, the Ordinance merely provides that

only 1,000 passengers may disembark in Bar Harbor on a given day. Cruise lines are free to continue to operate as they so choose. Cruise lines, including those with ships with more than 1,000-passenger capacity, may continue to call at Bar Harbor—but pier owners must limit disembarkations in accordance with the Ordinance—or they may simply call elsewhere. The laws in *Bibb* and *Sullivan* afforded operators no such choice. Moreover, the laws in *Bibb* and *Sullivan* provided no local benefit—indeed, they actively *reduced* safety. By contrast, the Ordinance benefits the people of Bar Harbor by reducing congestion caused by cruise ships disembarkations and improving their quality of life. *See supra* Part II.B.

## III. The Ordinance Does Not Violate APPLL's Due Process Rights.

APPLL argues, in perfunctory fashion, that the Ordinance violates their substantive due process rights. "[U]nder the federal Due Process Clause, a state action will be reviewed for strict scrutiny only where it interferes with a fundamental right; otherwise, it is reviewed under the more lenient rational basis standard." *Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022). "A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest." *Cook v.*

*Gates*, 528 F.3d 42, 55 (1st Cir. 2008). This standard is satisfied as long as there is some "reasonably conceivable state of facts that could provide a rational basis" for the challenged law. *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015).

APPLL concedes, as it must, that the rational basis standard applies, but fails to carry its heavy burden under that standard, rehashing the same flawed arguments made in support of the Commerce Clause challenge. APPLL also assigns significance to the fact that the Ordinance applies year-round, while cruise ships only visit seasonally. APPLL fails to explain how setting a *maximum* number of daily disembarkations is any less rational depending on what time of year cruise ships have traditionally chosen to visit. More importantly, this type of narrow tailoring argument has absolutely no relevance to a rational basis analysis. *See Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 85 (1988) (noting legislation need not be "perfectly calibrated in order to pass muster under the rational-basis test"); *United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007) ("Rational-basis review . . . does not require a perfect or exact fit between the means used and the ends sought.") Where it is certainly "conceivable' that the Ordinance will

reduce congestion and otherwise improve quality of life in Bar Harbor—

indeed, the evidence showed and the district properly found that it would,

*see supra* Part II.B—the Ordinance easily survives rational basis review.

## IV. APPLL Has Neither Pleaded Nor Proven a Violation of the Right to Travel.

The issue of the constitutional right to travel was not preserved in

the district court and is not properly before this Court on appeal. APPLL

did not plead any violation of the right to travel in its 128-paragraph

complaint (App. 26-58),[12] and indeed affirmatively swore off any claim

based on the right to travel and acknowledged that it did not have

standing to assert such a claim, writing in its Motion for Preliminary

Injunction that it "do[es] not . . . plead the rights of the traveling public."

(Mot. for Prelim. Inj., ECF 12, at 24 n.12.) Where APPLL first raised the

right to travel in its post-trial brief, and even then did so only in

perfunctory fashion, the district court properly concluded that APPLL

waived any such argument. (APPLL Add. 37 n.23.) *See, e.g.*, *United*

*States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed

---

[12] The Pilots did not raise the right to travel in the district court, and do not attempt to raise it on appeal.

argumentation, are deemed waived.") Arguments waived in the district court cannot be revived on appeal. *See, e.g.*, *De Mercadeo v. Emanuelli-Hernández*, 72 F.4th 361, 365 (1st Cir. 2023) ("Arguments raised in the District Court in a perfunctory and underdeveloped . . . manner are waived on appeal." (quoting *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991))); *United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals.").

APPLL's briefing of the issue in this Court is no less perfunctory. After spending multiple pages excoriating the district court for not reading into their Commerce Clause claims a nonexistent right to travel claim, APPLL simply "incorporate[s] by reference [its] Commerce Clause arguments," (APPLL Br. 42-43), leaving one to wonder as to the point of the entire exercise. APPLL has yet again waived any right to travel argument.

Even if the right to travel were in play here, it would avail APPLL nothing. The "right to travel" consists of three components: (1) the right to leave one state and enter another, (2) the right to be "treated as a welcome visitor rather than an unfriendly alien when temporarily

present" in another state," and (3) the right of travelers who elect to become permanent residents to be treated like other citizens of that state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). Only the first component—the right to physically enter the state—is even arguably at issue here. Travelers do not have a constitutional right to the most convenient form of travel. *Town of Southold*, 477 F.3d at 54; *Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982). Likewise, "burdens on a single mode of transportation do not implicate the right to interstate travel." *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999). A law survives rational basis review so long as there is some "reasonably conceivable state of facts that could provide a rational basis" for the law. *Mulero-Carrillo*, 790 F.3d at 107.

As with APPLL's due process challenge, the Ordinance easily clears this exceedingly low bar. There is no right to interstate travel by cruise ship, much less to *unfettered* travel by such means to any location within a state one desires. *See Town of Southold*, 477 F.3d at 54; *Miller*, 176 F.3d at 1205; *Houston*, 679 F.2d at 1198. APPLL, as it concedes, has no standing to assert the rights of the traveling public in any event. Even if the right to travel were implicated, it is certainly "conceivable" that the

Ordinance will reduce congestion caused by cruise ship disembarkations and otherwise improve the quality of life of Bar Harbor's 5,500 residents.

Amici—who improperly attempt to make APPLL's right to travel arguments for it—are simply wrong that strict scrutiny applies. (PLC Br. at 10-11; CLIA Br. at 10-12.) That standard applies only to restrictions on *migration*—that is, travel "with intent to settle and abide." *Cole v. Housing Auth.*, 435 F.2d 807, 811 (1st Cir. 1970). The cases cited by amici notably deal with such migration. *See, e.g., Saenz*, 526 U.S. at 504 ("Neither mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that discriminates against some of its citizens because they have been domiciled in the State for less than a year."); *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904 (1986) (requiring compelling justification where a "distinction drawn by the State between older and newer residents burdens the right to migrate"). At the risk of stating the obvious, cruise tourists visiting Bar Harbor for a few hours before moving on to their next port of call are not travelers "with intent to settle and abide." (PX 195 at 17.)

**V.   The Maine Pilotage Act Does Not Preempt the Ordinance.**

The Pilots argue that the Ordinance is preempted by 38 M.R.S. §§ 85 *et seq.* (the "Pilotage Act").[13] Not so.

The Maine Constitution grants municipalities broad "home rule" authority to enact laws "on all matters, not prohibited by Constitution or general law, which are local and municipal in character." Me. Const. art. VIII, pt. 2, § 1. The Maine Legislature has codified and implemented this constitutional reservoir of municipal authority in 30-A M.R.S. § 3001, which provides that municipalities have all powers not denied to them "expressly or by clear implication." *See also Portland Pipe Line Corp. v. City of S. Portland*, 2020 ME 125, ¶ 23, 240 A.3d 364, 370 (interpreting this provision).

While the Maine Legislature has enacted laws regulating navigation, it has made clear that municipalities retain home rule authority over their own local waters. Maine's Harbor Masters Act, 38 M.R.S. §§ 1-13, explicitly recognizes and leaves undisturbed "the authority of municipalities to enact ordinances to regulate . . . activities

---

[13] In the district court, the Pilots also argued that the Ordinance was preempted by Maine statutes relating to the promotion of tourism. They have abandoned that argument on appeal.

in their harbors," and even explicitly identifies municipalities' constitutional and statutory home rule powers as the source of that authority. 38 M.R.S. § 7.

The Pilotage Act establishes the Maine Pilotage Commission and requires that certain vessels entering or departing from certain ports or harbors in Maine take a pilot licensed under those statutes. 38 M.R.S. §§ 86, 86-A, 87-A, 89-90. The goal of the Pilotage Act is to ensure the safety of vessels entering and leaving Maine waters. 38 M.R.S. § 85. To that end, the Act makes pilotage compulsory for covered vessels, and likewise requires that pilots provide those services. (7/11/23 Tr. at 93:13-21.) The Act also charges the Pilotage Commission with setting pilots' rates. 38 M.R.S. §§ 90(1)(B), 96.

Nothing in the Pilotage Act expressly or by clear implication requires that very large cruise ships come to Bar Harbor, much less that they be permitted to disembark more than 1,000 passengers daily. Limiting cruise ship disembarkations in Bar Harbor to 1,000 passengers daily poses absolutely no threat to the safety of vessels navigating in Maine waters. Indeed, if large cruise ships were to choose to remove Bar Harbor from itineraries due to the disembarkation limitations imposed

by the Ordinance, this would arguably enhance the safety of nearby waters by reducing the volume of large ship traffic. The Pilotage Act as applied to Frenchman's Bay was enacted in 1985, *see* P.L. 1985, c. 389, § 33, long before any significant large cruise ship traffic came to Bar Harbor, so the Legislature could have hardly intended the Act to require Bar Harbor to maximize the number of cruise ships coming to Bar Harbor in need of a pilot. There is no reason, in law or logic, why the pilotage system would not continue as designed if less large cruise ships called at Bar Harbor.

The Pilots suggest that a "prohibition on anchoring of vessels whose lower berth capacities exceeded 1,000 . . . would directly usurp a pilot's authority to pilot any vessel required to take a state pilot anywhere upon the pilot's pilotage area," referring to 38 M.R.S. § 97. (Pilots Br. at 62 n.56.) But, of course, the Ordinance does not "prohibit" vessels of any size from doing anything, much less dictate where they can or cannot anchor, or where pilots can take them. Rather, it imposes limits on *pier owners* as to how many cruise passengers may disembark over their properties on a given day. That larger cruise vessels might *choose* not to visit Bar Harbor in light of this limitation has no bearing whatsoever on the Pilots'

authority to pilot vessels anywhere. The Pilots conflate the absence of *demand* with the absence of *authority*.

The Pilots' real complaint is that the Ordinance might reduce their revenue if less large cruise ships choose to call at Bar Harbor. But, as the Pilots admitted in their post-trial brief in the district court, the Pilotage Act "does not guarantee financial success or wealth for State-licensed Pilots." (ECF 190 at 47.) The purpose of the Act and the pilotage system it creates is to ensure safety, not to generate revenue. (7/11/23 Tr. at 90:18-21.) Nothing in the Act requires the people of Bar Harbor, or any other municipality, to give up their home rule authority or subordinate their quality of life in order to maximize revenue for the Pilots. The Act grants State-licensed pilots a monopoly on legally required pilotage services, and accordingly controls the rates for those services. The Pilots may request—and there is no evidence they have ever been denied—a rate increase as necessary to maintain service.[14] The Pilots tailoring their

---

[14] As Captain David Gelinas—President of the Pilots and a member of the Pilotage Commission for nearly two decades—testified, the Pilotage Commission is committed to ensuring safety of its pilots. (7/11/23 Tr. at 96:2-13.) The Pilots were granted a substantial rate increase as recently as January 1, 2023, in part because of the complete cessation of cruise ship visitation due to the COVID-19 pandemic. (7/11/23 Tr. at 58-59.)

operations to the demand for their services is precisely what the Act contemplates.

## CONCLUSION

For all of the foregoing reasons, the Town respectfully requests that this Court affirm the decision of the district court.

Dated at Bangor, Maine, this 18th day of September, 2024.

*/s/ Jonathan P. Hunter, Esq.*
Jonathan P. Hunter, Bar No. 1210939
jhunter@rudmanwinchell.com

*/s/ Stephen W. Wagner, Esq.*
Stephen W. Wagner, Bar No. 1212086
swagner@rudmanwinchell.com

Attorneys for Town of Bar Harbor
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.947.4501

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document excluded by Fed. R. App. P. 32(f), this document contains 12,970 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2408 Build 16.0.17928.20114) in 14-point Century Schoolbook font.

Dated: Sept. 18, 2024        */s/ Jonathan P. Hunter, Esq.*
                              Jonathan P. Hunter, Bar No. 1210939


## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit using the CM/ECF system, which will electronically serve and provide notice to all counsel of record in this case.

Dated: Sept. 18, 2024        */s/ Jonathan P. Hunter, Esq.*
                              Jonathan P. Hunter, Bar No. 1210939

Case Nos. 24-1317, 24-1318, 24-1385
United States Court of Appeals for the First Circuit

---

**ASSOCIATION TO PRESERVE AND PROTECT LOCAL
LIVELIHOODS; B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C.,
d/b/a Harborside Hotel; B.H.W.W., L.L.C.; DELRAY EXPLORER
HULL 495 LLC; DELRAY EXPLORER HULL 493 LLC; ACADIA
EXPLORER 492, LLC; PENOBSCOT BAY AND RIVER PILOTS
ASSOCIATION**,

*Plaintiffs - Appellants/Cross-Appellees*

v.

**CHARLES SIDMAN**,

*Defendant - Appellee/Cross-Appellant,*

**TOWN OF BAR HARBOR**,
a Municipal Corporation of the State of Maine,

*Defendant-Appellee.*

---

On appeal from the United States District Court
for the District of Maine
Civil Action No. 1:22-cv-416-LEW

---

**ADDENDUM TO BRIEF OF TOWN OF BAR HARBOR**

Jonathan P. Hunter, Bar No. 1210939
Stephen W. Wagner, Bar No. 1212086
RUDMAN WINCHELL
84 Harlow Street, P.O. Box 1401
Bangor, ME 04402
207.947.4501

# TABLE OF CONTENTS

U.S. Const. art. I, § 8, cl. 3 ........................................................Add. 1

U.S. Const. art. III, § 2 ...............................................................Add. 4

U.S. Const. art. VI, cl. 2 .............................................................Add. 6

Me. Const. art. VIII, pt. 2, § 1 ...................................................Add. 7

30-A M.R.S. § 3001 ....................................................................Add. 9

38 M.R.S. §§ 1-13........................................................................Add. 10

38 M.R.S. §§ 85 *et seq.* ..............................................................Add. 17

P.L. 1985, c. 389, § 33................................................................Add. 27

33 C.F.R. § 105.200 ....................................................................Add. 32

33 C.F.R. § 105.237 ....................................................................Add. 34

33 C.F.R. Chapter I, Subchapter I, Parts 109-110 (excerpts) ..Add. 36

Bar Harbor Code ch. 52.............................................................Add. 42

Bar Harbor Code § 125-77(H) ..................................................Add. 45

Stipulations, ECF 137.................................................................Add. 47



# Constitution of the United States

Italicized text indicates words and passages of the Constitution that were changed or affected by amendments.

## Original Text

### Preamble

We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

### Article I
Section 1   Section 2   Section 3   Section 4   Section 5   Section 6   Section 7
Section 8   Section 9   Section 10

### Section 1

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

### Section 2

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it.  If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

**Section 8**

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

### Section 4

The President, Vice President and all Civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

### Article III
Section 1   Section 2   Section 3

### Section 1

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

### Section 2

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; —to all Cases affecting Ambassadors, other public ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**Section 3**

Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

**Article IV**
Section 1   Section 2   Section 3   Section 4

**Section 1**

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

**Section 2**

The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that *no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article*; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

**Article VI**

All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

**Article VII**

# CONSTITUTION OF THE STATE OF MAINE

**(Arranged by the Chief Justice of the Maine Supreme Judicial Court and approved by the Maine State Legislature, Resolve 2023, chapter 86, pursuant to the Constitution of Maine, Article X, Section 6)**

**(Includes CR 2023, c. 1 and CR 2023, c. 2)**

## PREAMBLE.

**Objects of government.**  We the people of Maine, in order to establish justice, insure tranquility, provide for our mutual defense, promote our common welfare, and secure to ourselves and our posterity the blessings of liberty, acknowledging with grateful hearts the goodness of the Sovereign Ruler of the Universe in affording us an opportunity, so favorable to the design; and, imploring God's aid and direction in its accomplishment, do agree to form ourselves into a free and independent State, by the style and title of the State of Maine and do ordain and establish the following Constitution for the government of the same.

## Article I.

## Declaration of Rights.

**Section 1.  Natural rights.**  All people are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.

**Section 2.  Power inherent in people.**  All power is inherent in the people; all free governments are founded in their authority and instituted for their benefit; they have therefore an unalienable and indefeasible right to institute government, and to alter, reform, or totally change the same, when their safety and happiness require it.

**Section 3.  Religious freedom; sects equal; religious tests prohibited; religious teachers.**  All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshipping God in the manner and season most agreeable to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, provided that that person does not disturb the public peace, nor obstruct others in their religious worship; -- and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or

**Article VIII.**

**Part Second.**

**Municipal Home Rule.**

**Section 1.  Power of municipalities to amend their charters.**  The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character.  The Legislature shall prescribe the procedure by which the municipality may so act.

**Section 2.  Construction of buildings for industrial use.**  For the purposes of fostering, encouraging and assisting the physical location, settlement and resettlement of industrial and manufacturing enterprises within the physical boundaries of any municipality, the registered voters of that municipality may, by majority vote, authorize the issuance of notes or bonds in the name of the municipality for the purpose of purchasing land and interests therein or constructing buildings for industrial use, to be leased or sold by the municipality to any responsible industrial firm or corporation.

**§3001. Ordinance power**

Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter. [PL 1987, c. 737, Pt. A, §2 (NEW); PL 1987, c. 737, Pt. C, §106 (NEW); PL 1989, c. 6 (AMD); PL 1989, c. 9, §2 (AMD); PL 1989, c. 104, Pt. C, §§8, 10 (AMD).]

**1. Liberal construction.** This section, being necessary for the welfare of the municipalities and their inhabitants, shall be liberally construed to effect its purposes.
[PL 1987, c. 737, Pt. A, §2 (NEW); PL 1987, c. 737, Pt. C, §106 (NEW); PL 1989, c. 6 (AMD); PL 1989, c. 9, §2 (AMD); PL 1989, c. 104, Pt. C, §§8, 10 (AMD).]

**2. Presumption of authority.** There is a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority.
[PL 1987, c. 737, Pt. A, §2 (NEW); PL 1987, c. 737, Pt. C, §106 (NEW); PL 1989, c. 6 (AMD); PL 1989, c. 9, §2 (AMD); PL 1989, c. 104, Pt. C, §§8, 10 (AMD).]

**3. Standard of preemption.** The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law.
[PL 1987, c. 737, Pt. A, §2 (NEW); PL 1987, c. 737, Pt. C, §106 (NEW); PL 1989, c. 6 (AMD); PL 1989, c. 9, §2 (AMD); PL 1989, c. 104, Pt. C, §§8, 10 (AMD).]

**4. Penalties accrue to municipality.** All penalties established by ordinance shall be recovered on complaint to the use of the municipality.
[PL 1987, c. 737, Pt. A, §2 (NEW); PL 1987, c. 737, Pt. C, §106 (NEW); PL 1989, c. 6 (AMD); PL 1989, c. 9, §2 (AMD); PL 1989, c. 104, Pt. C, §§8, 10 (AMD).]

SECTION HISTORY

PL 1987, c. 737, §§A2,C106 (NEW). PL 1989, c. 6 (AMD). PL 1989, c. 9, §2 (AMD). PL 1989, c. 104, §§C8,10 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular and First Special Session of the 131st Maine Legislature and is current through November 1. 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.

# CHAPTER 1

## OPERATION OF VESSELS

## SUBCHAPTER 1

## HARBOR MASTERS

### §1. Appointment; compensation

The municipal officers of a town that borders or contains territorial waters, on request by any person desiring mooring privileges or regulation of mooring privileges for boats or vessels, shall appoint a harbor master for a term of not less than one year, who is subject to all the duties and liabilities of that office as prescribed by state law, municipal ordinances and regulations adopted by the municipal officers, municipal harbor commissioners, municipal port authorities or other such bodies empowered to regulate municipal harbors. The municipal officers may establish the harbor master's compensation and, for cause by them declared in writing, after due notice to the officer and hearing, if requested, remove the harbor master and appoint another one. [PL 2005, c. 492, §4 (AMD).]

The municipal officers may prohibit a harbor master from making arrests or carrying a weapon. A harbor master may not make arrests or carry a firearm unless the harbor master has successfully completed the training requirements prescribed in Title 25, section 2804-I. Any law enforcement officer vested with the authority to carry a weapon and make arrests has the authority to enforce this subchapter. [PL 1999, c. 682, §6 (AMD).]

For purposes of this section, "territorial waters" has the same meaning as provided in Title 12, section 6001, subsection 48-B. [PL 2005, c. 492, §4 (NEW).]

SECTION HISTORY

PL 1977, c. 696, §330 (AMD). PL 1985, c. 531, §2 (AMD). PL 1985, c. 692, §§1,4 (RPR). PL 1987, c. 412, §§1,8 (RPR). PL 1987, c. 655, §1 (AMD). PL 1999, c. 682, §6 (AMD). PL 2005, c. 492, §4 (AMD).

### §1-A. Training

The following provisions govern the training of harbor masters and deputy harbor masters appointed pursuant to section 1 or 2. [PL 2005, c. 525, §1 (NEW).]

**1. Basic training course.** A person appointed or reappointed a harbor master or a deputy harbor master after August 31, 2006 must complete a basic harbor master training course offered by a statewide harbor masters association that represents Maine harbor masters within one year after being appointed or reappointed unless that person has previously completed such a course. If a person has not held the position of harbor master or deputy harbor master within the last 5 years prior to being appointed or reappointed, that person upon appointment or reappointment must complete the basic harbor master training course.
[PL 2021, c. 53, §1 (AMD).]

**1-A. Continuing education.** A person appointed or reappointed a harbor master or deputy harbor master who has completed the basic training course under subsection 1 shall complete, at a minimum, 8 hours of training every 3 years to maintain certification as a harbor master or deputy harbor master. The training requirement of this subsection may be met by completing continuing education training offered or approved by a statewide harbor masters association that represents Maine harbor masters. [PL 2021, c. 53, §1 (NEW).]

**2. Payment; reimbursement.** Nothing in this section may be construed to prohibit a municipality, at its sole discretion, from paying for or reimbursing a harbor master or deputy harbor master for the cost of training under this section.
[PL 2021, c. 53, §1 (AMD).]

**3. Additional training.** Nothing in this section may be construed to prohibit a municipality from requiring a harbor master or deputy harbor master to obtain training beyond that required by this section.
[PL 2005, c. 525, §1 (NEW).]

**4. Training format.** During any 3-year period, the training courses offered by the statewide harbor masters association must include, at a minimum, in-person, remote and online options.
[PL 2021, c. 53, §1 (NEW).]

SECTION HISTORY

PL 2005, c. 525, §1 (NEW). PL 2017, c. 54, §1 (AMD). PL 2021, c. 53, §1 (AMD).

### §2. Rules for channel lines; enforcement

The municipal officers of all maritime towns and plantations, other bodies empowered to regulate municipal harbors and the county commissioners in the case of maritime unorganized townships may make rules and regulations, with suitable provision for enforcement, to keep open convenient channels for the passage of vessels in the harbors and waterways of the towns or townships for which they act, and may establish the boundary lines of those channels and assign suitable portions of their harbors and other coastal and tidal waters within their jurisdiction for anchorages. [PL 1987, c. 655, §2 (AMD).]

In the event fishing gear is within the boundary lines of a channel in violation of local rules, the harbor master may issue a warning of navigational interference and may commence court action to order removal of that gear. [PL 1987, c. 655, §2 (NEW).]

Such rules and regulations as may be made by those municipal officers, other bodies empowered to regulate harbors or county commissioners shall be enforced and carried out by the harbor master of that town or unorganized township, or any other law enforcement officer of the State or any political subdivision of the State. [PL 1987, c. 655, §2 (AMD).]

The harbor master may appoint deputies who, under the harbor master's direction, shall enforce and carry out the rules and regulations of this section. [RR 2021, c. 2, Pt. B, §224 (COR).]

SECTION HISTORY

PL 1965, c. 242 (AMD). PL 1987, c. 412, §§2,8 (AMD). PL 1987, c. 655, §2 (AMD). RR 2021, c. 2, Pt. B, §224 (COR).

### §3. Mooring sites

In all harbors wherein channel lines have been established by the municipal officers, as provided in section 2, and in all other coastal and tidal waters, harbors and great ponds where mooring rights of individuals are claimed to be invaded and protection is sought of the harbor master, the harbor master shall assign and indicate only to the masters or owners of boats and vessels the location that they may occupy for mooring purposes and shall change the location of those moorings from time to time when the crowded condition of that harbor or great pond, the need to conform to section 7-A or other conditions render the change desirable. [PL 1991, c. 838, §16 (AMD).]

Unless permitted by an ordinance adopted under section 3-A, mooring assignments may not be transferred. Assignments may not be rented unless the provision for rental was part of the agreement when the mooring was assigned. [PL 1991, c. 685, §1 (AMD).]

Assignment of these mooring privileges does not confer any right, title or interest in submerged or intertidal lands owned by the State. To the extent that there is any inconsistency between this subchapter and any law that establishes or otherwise provides for a port authority, board of harbor

commissioners or similar authority for any coastal waters of the State, that inconsistency must be resolved in favor of this subchapter.  [PL 2003, c. 660, Pt. A, §23 (AMD).]

Whenever practicable, the harbor master shall assign mooring privileges in those waters where individuals own the shore rights to a parcel of land, are masters or owners of a boat or vessel and are complainants, and shall locate suitable mooring privileges therefor for boats and vessels, temporarily or permanently, as the case may be, fronting their land, if so requested, but not to encroach upon the natural channel or channels established by municipal officers; provided that not more than one mooring may be assigned to any shorefront parcel of land under this privilege. Notwithstanding section 11, persons who, prior to January 1, 1987, owned shore rights of at least 100 feet of frontage regardless of the size of the lot have mooring privileges assigned according to this section. The limitation of one mooring assigned under this privilege does not prevent the owner of a shorefront parcel from receiving additional mooring assignments under the allocation system for all other residents.  [PL 2003, c. 660, Pt. A, §23 (AMD).]

A harbor master may refuse to assign mooring privileges to any vessel or boat owner or master who has not paid any fee, charge for services, forfeiture or penalty levied pursuant to this subchapter.  [PL 1987, c. 655, §3 (NEW).]

Municipalities may not charge mooring fees for and do not have jurisdiction over the siting or specifications of structural moorings used to secure aquaculture equipment within the boundaries of a lease site when that site's lease is issued pursuant to Title 12, section 6072, 6072-A or 6072-B.  [PL 2003, c. 660, Pt. A, §23 (NEW).]

Municipalities have jurisdiction over boat and vessel moorings within the boundaries of a lease site when that site's lease is issued pursuant to Title 12, section 6072, 6072-A or 6072-B.  A municipality may not charge a mooring fee for a boat or vessel within the boundaries of a lease that is inconsistent with that municipality's other mooring fees for commercial vessels.  [PL 2003, c. 660, Pt. A, §23 (NEW).]

A harbor master, a code enforcement officer or, in the case of a great pond located in an unorganized territory, a board of county commissioners of the county in which the unorganized territory is located may direct the master or owner of a boat or vessel to remove that person's mooring or floating dock from a great pond if the harbor master, code enforcement officer or the board of county commissioners determines that leaving the mooring or floating dock in during ice-in conditions would create a public safety hazard.  [PL 2015, c. 105, §1 (NEW).]

SECTION HISTORY

PL 1987, c. 412, §§3,8 (RPR). PL 1987, c. 655, §3 (RPR). PL 1991, c. 685, §1 (AMD). PL 1991, c. 838, §16 (AMD). PL 2003, c. 660, §A23 (AMD). PL 2015, c. 105, §1 (AMD).

### §3-A.  Mooring transfer permitted by ordinance

A municipality may adopt an ordinance that allows the transfer of a mooring assignment used for commercial fishing purposes.  The ordinance may permit a mooring assignment to be transferred only at the request or death of the assignee, only to a member of the assignee's family and only if the mooring assignment will continue to be used for commercial fishing purposes.  For the purposes of this section, "member of the assignee's family" means an assignee's parent, child or sibling, by birth or by adoption, including a relation of the half blood, or an assignee's spouse.  [PL 1993, c. 66, §1 (AMD).]

SECTION HISTORY

RR 1991, c. 2, §140 (COR). PL 1991, c. 685, §2 (NEW). PL 1993, c. 66, §1 (AMD).

### §4.  Neglecting to remove or replace moorings

In case of the neglect or refusal of the master or owner of any boat or vessel to remove the master's or owner's mooring or to replace it by one of different character when so directed by the harbor master,

that harbor master shall cause the entire mooring to be removed or the buoy removed and the chain dropped to the bottom or shall make such change in the character of the mooring as required, and collect from the master or owner of that boat or vessel the sum of $100 for either of those services rendered and the necessary expenses. [RR 2021, c. 2, Pt. B, §225 (COR).]

Before removing a mooring or a buoy, a harbor master shall notify the master or owner, if ownership can be determined, by mail at the master's or owner's last known address of the action desired of the master or owner, the fact that the mooring will be removed and the fine. If the matter is not settled to the harbor master's satisfaction within 2 weeks, the harbor master may take the action provided for in this section. [RR 2021, c. 2, Pt. B, §225 (COR).]

SECTION HISTORY

PL 1987, c. 412, §§4,8 (RPR). RR 2021, c. 2, Pt. B, §225 (COR).

§5.  Removal of vessels obstructing anchorage

A harbor master, upon receiving complaint from the master, owner or agent of any vessel, shall cause any other vessel or vessels obstructing the free movement or safe anchorage of that vessel to remove to a position to be designated by the harbor master and shall cause, without any complaint being made to the harbor master, any vessels anchoring within the channel lines as established by the municipal authorities, as provided in section 2, to remove to such anchorage as the harbor master may designate. [PL 1987, c. 655, §4 (AMD).]

If that vessel has no crew on board or if the master or other person in charge neglects or refuses to move such vessel as directed by the harbor master, the harbor master may put a suitable crew on board and move that vessel to a suitable berth at a wharf or anchorage at the cost and risk of the owners of the vessel and shall charge $100, to be paid by the master or owner of that vessel, which charge, together with the cost of the crew for removing that vessel the harbor master may collect by civil action. [PL 1987, c. 412, §§ 5, 8 (RPR).]

SECTION HISTORY

PL 1977, c. 696, §331 (AMD). PL 1987, c. 412, §§5,8 (RPR). PL 1987, c. 655, §4 (AMD).

§6.  Power to arrest for assault

Harbor masters, whose authority is not restricted as described in section 1, may arrest and deliver to the police authorities on shore any person committing an assault upon them or another person acting under their authority. [PL 1985, c. 531, §3 (AMD).]

SECTION HISTORY

PL 1985, c. 531, §3 (AMD).

§7.  Relation to other laws

Nothing in this subchapter may be construed to be a limitation on the authority of municipalities to enact ordinances to regulate the assignment or placement of moorings and other activities in their harbors.  These ordinances may include, but are not limited to:  A process for assigning mooring privileges and determining the location of moorings; a waiting list for the assignment of mooring privileges; a fee schedule; construction standards for moorings; time limits on the mooring of vessels; a process for appeals from decisions of the harbor master; provisions that recognize that mooring privileges in lawful existence on the effective date of an ordinance may be preserved or continued after adoption of that ordinance, the location and use to be determined by the harbor master or other appropriate local authority; and provisions that establish a harbor commission or committee to administer the ordinance or ordinances and oversee the duties of the harbor master.  Regulations adopted by the municipal officers under section 2 remain in effect unless the municipality's legislative

body enacts an ordinance pertaining to the same matter pursuant to the Constitution of Maine, Article VIII, Part 2, and Title 30-A, section 3001.  [PL 1997, c. 89, §1 (AMD).]

SECTION HISTORY

PL 1985, c. 692, §§2,4 (NEW). PL 1987, c. 412, §§6,8 (AMD). PL 1987, c. 655, §5 (RPR). PL 1997, c. 89, §1 (AMD).

### §7-A.  Waiting lists; nonresident moorings

**1.  Waiting lists.**  If a municipality receives more applications for mooring privileges on state-owned lands that are controlled by its rules or ordinances than there are mooring spaces, the municipality shall assign spaces as they become available from a waiting list or lists according to its rules or ordinances, except as provided in this section.  Waiting lists in effect at the time that this section becomes law may continue in effect, but persons shall be selected from those lists in accordance with the allocation provisions of this section.  If at the time a person applies for a mooring there is no waiting list, this person may be assigned a mooring without regard to the allocation provisions of this section. [PL 1987, c. 655, §6 (NEW).]

**2.  Allocations to nonresidents.**  If there are applicants who are nonresidents who wish to moor a vessel the principal use of which is noncommercial and less than 10% of the moorings are currently assigned to persons fitting this description, the next mooring available shall be assigned to the first such person on the list.  If there are applicants who are nonresidents who wish to moor a vessel the principal use of which is commercial and less than 10% of the assigned moorings are currently assigned to persons fitting this description, the next mooring available shall be assigned to the first such person on the list.  If both nonresident noncommercial and nonresident commercial assignments are below 10% and there are both types of applicants on the waiting list, the available space shall be assigned to an applicant in the category that is the farthest below 10%.  The burden of proof in determining residence and the principal use of a vessel shall be upon the applicant.

Each year, persons with mooring assignments shall report to the harbor master their anticipated residency status for the next year and whether they anticipate the principal use of their boats to be commercial or noncommercial.  The harbor master shall update the percentage of mooring holders in each category from this data.

It is not a requirement of this section that a person lose a current mooring assignment to meet the objectives of this section.

Shorefront property owners shall be assigned mooring privileges as established in section 3.

If the mooring fee charged to nonresidents exceeds $20 a year, the fee charged shall be reasonable in relation to the costs involved in providing that mooring and shall not exceed 5 times the amount charged to residents.

This subsection shall be construed broadly in order to accomplish the distribution of moorings to nonresidents as specified in this section.
[PL 1987, c. 655, §6 (NEW).]

SECTION HISTORY

PL 1987, c. 655, §6 (NEW).

### §8.  Waiting list

Whenever there are more applicants for a mooring assignment than there are mooring spaces available, the harbor master or other town official shall create a waiting list. The town officials shall work out a reasonable procedure for persons to add their names to this list. The procedure shall be posted in a public place. The list shall be considered a public document under the freedom of access law.  [PL 1987, c. 412, §§ 7, 8 (NEW).]

SECTION HISTORY

PL 1987, c. 412, §§7,8 (NEW).

**§9. Abandonment of watercraft**

No person may bring into or maintain in the harbor any derelict watercraft, watercraft for salvage, or abandon any watercraft in the harbor without a permit from the harbor master or, if there is no harbor master, the appropriate municipal official. Whoever does so without permit is guilty of a Class E crime. Watercraft which are to be salvaged by firms licensed by the State to do salvage work shall be excluded from this section. The municipal board or commission entrusted with harbor management shall be the sole determiner as to what constitutes a watercraft that is derelict and what constitutes a watercraft that is abandoned.  [PL 1987, c. 412, §§ 7, 8 (NEW).]

SECTION HISTORY

PL 1987, c. 412, §§7,8 (NEW).

**§10. Harbor master liability**

In addition to the immunities from liability and the limitations and defenses provided under the Maine Tort Claims Act, Title 14, sections 8103, 8111 and 8112, a harbor master who, in the performance of statutory duties as set forth in sections 4 and 5, causes any damage to property or any injury to a person shall not be liable for damage or injury, unless the damage or injury is a direct result of the gross negligence, gross recklessness or bad faith intentional misconduct of the harbor master. [PL 1987, c. 655, §7 (AMD).]

SECTION HISTORY

PL 1987, c. 412, §§7,8 (NEW). PL 1987, c. 655, §7 (AMD).

**§11. Definitions**

As used in this subchapter, unless the context otherwise indicates, the following terms have the following meanings.  [PL 1991, c. 548, Pt. D, §9 (AMD).]

**1. Municipal resident.**  "Municipal resident" means any person who occupies a dwelling within the municipality for more than 180 days in a calendar year. A municipality may by ordinance include other persons in the definition of resident.
[PL 1987, c. 412, §§ 7, 8 (NEW).]

**2. Parcel of land.**  "Parcel of land" means the larger of the minimal buildable lot size in the municipality or 20,000 square feet and, in either case, including 100 feet of shoreline frontage.
[PL 1987, c. 412, §§ 7, 8 (NEW).]

**3. Watercraft.**  "Watercraft" means any type of vessel, boat, barge, float or craft used or capable of being used as a means of transportation on water other than a seaplane.
[PL 1987, c. 412, §§ 7, 8 (NEW).]

SECTION HISTORY

PL 1987, c. 412, §§7,8 (NEW). PL 1991, c. 548, §D9 (AMD).

**§12. Violation of subchapter**

Except as provided in section 13, a violation of this subchapter or any harbor ordinance may be prosecuted and relief, fees, fines and penalties granted and assessed pursuant to the provisions of Title 30-A, section 4452.  [PL 1991, c. 262, §1 (AMD).]

SECTION HISTORY

PL 1987, c. 655, §8 (NEW). PL 1989, c. 287, §5 (RPR). PL 1991, c. 262, §1 (AMD).

### §13. Failure to obey orders of harbormasters

**1. Offense defined.** A person is guilty of failure to obey an order of a harbormaster if the person intentionally, knowingly or recklessly fails to obey any lawful order of a harbormaster authorized pursuant to this subchapter.
[PL 1991, c. 262, §2 (NEW).]

**2. Penalty.** Failure to obey an order of a harbormaster is a Class E crime.
[PL 1991, c. 262, §2 (NEW).]

SECTION HISTORY

PL 1991, c. 262, §2 (NEW).

## SUBCHAPTER 2

## PORT WARDENS

### §41. Election; qualifications; term; removal; vacancies; records

Port wardens must be elected in any city or town situated on navigable waters upon the petition of 10 or more citizens engaged in commercial pursuits therein. [RR 2021, c. 2, Pt. B, §226 (COR).]

If in such city or town there is a board of trade duly incorporated, that board shall annually elect the port warden. Otherwise the municipal officers thereof shall annually elect the port warden. [RR 2021, c. 2, Pt. B, §226 (COR).]

Port wardens must have commercial or nautical experience and hold office one year from each election and until others are qualified in their stead, except when removed for cause or when elected to serve out an unexpired term. They must be sworn faithfully to perform their duties. [RR 2021, c. 2, Pt. B, §226 (COR).]

Boards of trade, by their managers, or municipal officers shall forthwith on complaint of any person aggrieved, after hearing, remove for cause any port warden by them elected, and all vacancies must be filled by those authorities. [RR 2021, c. 2, Pt. B, §226 (COR).]

Port wardens shall make a record of their doings and keep the same in their office for inspection at any time, free of charge, by any person interested therein.

SECTION HISTORY

RR 2021, c. 2, Pt. B, §226 (COR).

### §42. Duties; vessels arriving

When requested by any person interested, port wardens shall proceed on board of any vessel on her arrival in port and survey her hatches and notice if they are properly caulked and secured, and if they have been opened by some person not a port warden, that fact shall be noticed, and all the facts in relation to the hatches of said vessel shall be entered in the official record. They shall examine the condition and stowage of the cargo of any vessel, and if any portion of it is found to be damaged, they shall inquire into and ascertain the cause thereof, and make a memorandum of the same, noting particularly the marks and numbers of each damaged package, and shall enter the same in full in the records of their office. For the purpose of ascertaining the extent of said damage, they shall examine goods, wares or merchandise of any description in any warehouse or store, or on any wharf or at any place where the same are, provided said goods, wares or merchandise are part of the cargo and are claimed to be damaged. They shall note particularly the marks and numbers of every package examined by them and the extent of the damage received, and all the facts in relation thereto shall be entered in the records of their office.

### §43.  -- distressed vessels

When requested in writing by any person interested, port wardens shall survey the cargo of any vessel arriving in port in distress, and shall make and record in the books of their office, a full and particular report of the condition of said cargo, and of their recommendations in relation to the disposal of such portions of the same as in their judgment may not be in condition for reshipment, reference being had to the best interests of all concerned.

### §44.  -- wrecked or damaged vessels

When requested in writing by any person interested, port wardens shall survey any vessel which may have suffered wreck or damage, or which may be deemed unseaworthy. Such port wardens shall call to their assistance one merchant and one shipwright, both of whom shall be competent and disinterested persons and shall be sworn faithfully to perform their duties in the examination and survey. Said surveyors and port wardens shall examine the hull, spars, sails, rigging and all the appurtenances of said vessel, and make and record in the books of the port wardens' office a full and particular report of all the surveys by them held on said vessel, specifying what damage she has sustained and what repairs in their opinion are necessary to render her again seaworthy. The aforesaid report shall be presumptive evidence of the necessity of such repairs and of the sufficiency of the same when made.

### §45.  Fees

Port wardens shall be allowed fees to be paid by the person requesting their services, as follows: For survey of hatches, $2; for each survey of cargo on shipboard, $1; for certificate of stowage of cargo, $2; for each subsequent certificate, $1; for each survey to ascertain extent of damage, $2; for each certificate thereof, $2; for each survey required by section 43, $4; for each certificate thereof, $2; on each survey as required by section 44 for each person, $2; for each certificate thereof, $2.

### §46.  Jurisdiction; impersonation; penalty

In the cities and towns for which they are elected, port wardens shall have exclusive jurisdiction in all matters pertaining to their duties, as specified in this subchapter and subchapters III, IV and V. Any other person who performs or attempts to perform any such duties in any city or town wherein there is a port warden forfeits for each offense $100, to be recovered in a civil action by any prosecutor.

## SUBCHAPTER 3

## PILOTS

### §81.  Appointment; bond

**(REPEALED)**

SECTION HISTORY

PL 1975, c. 771, §413 (AMD). PL 1985, c. 389, §27 (RP).

### §82.  Duties

**(REPEALED)**

SECTION HISTORY

PL 1985, c. 389, §29 (RP).

### §83.  Fees; complaints; suspension or removal

**(REPEALED)**

SECTION HISTORY

PL 1975, c. 771, §414 (AMD). PL 1985, c. 389, §30 (RP).

**§84. Liability for damage**

**(REPEALED)**

SECTION HISTORY

PL 1985, c. 389, §31 (RP).

**§85. Declaration of policy**

It is declared to be the policy and intent of the Legislature and the purpose of this subchapter to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation for vessels entering or leaving the waters described in this subchapter, to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency and to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation. [PL 1999, c. 355, §2 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1985, c. 389, §32 (AMD). PL 1999, c. 355, §2 (AMD).

**§85-A. Definitions**

**(REPEALED)**

SECTION HISTORY

PL 1983, c. 758, §13 (NEW). PL 1991, c. 509, §46 (AMD). PL 1997, c. 727, §C17 (AMD). PL 1999, c. 355, §3 (RP).

**§85-B. Definitions**

As used in this subchapter, unless the context otherwise indicates, the following terms have the following meanings. [PL 1999, c. 355, §4 (NEW).]

**1. Actively piloting.** "Actively piloting" means a person licensed as a pilot by the commission who is engaged in providing pilot services on a regular and ongoing basis within the area for which that person is licensed.
[PL 1999, c. 355, §4 (NEW).]

**2. Coastal waters.** "Coastal waters" means the jurisdictional area of the commission, which waters are all coastal navigable waters that are contained within, flow through, or border upon the State or any portion thereof, including those portions of the Atlantic Ocean within the jurisdiction of the State, up to state or international boundaries, and including all waters between Isle au Haut and Seal Island westward of a straight line between Western Ear Ledge on Isle au Haut drawn to Eastern Ledge on Seal Island.
[PL 1999, c. 355, §4 (NEW).]

**3. Coastal zones.** "Coastal zones" means the 3 areas of Maine coastal waters relevant to the commission membership, Calais to Schoodic Point, Schoodic Point to Port Clyde, and Port Clyde to Kittery, excepting the port of Portland and Casco Bay.
[PL 1999, c. 355, §4 (NEW).]

**4. Commission.** "Commission" means the Maine Pilotage Commission.
[PL 1999, c. 355, §4 (NEW).]

**5. Commissioner.** "Commissioner" means the Commissioner of Transportation.
[PL 1999, c. 355, §4 (NEW).]

**6. Department.** "Department" means the Department of Transportation.

[PL 1999, c. 355, §4 (NEW).]

**7. Pilotage areas.** "Pilotage areas" means specific areas of the Maine coast where the commission has established licensing requirements.
[PL 1999, c. 355, §4 (NEW).]

SECTION HISTORY

PL 1999, c. 355, §4 (NEW).

**§86. Vessels required to take pilot**

Every foreign vessel and every American vessel under register, with a draft of 9 feet or more, entering or departing from any port or harbor within the waters described in section 86-A must take a pilot licensed under this chapter. Any master, owner, agent or consignee that fails to take a pilot licensed under this subchapter is subject to a civil penalty not to exceed $15,000 per day, payable to the State. This penalty is recoverable in a civil action. [PL 1999, c. 355, §5 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1985, c. 389, §32 (AMD). PL 1991, c. 698, §2 (AMD). PL 1999, c. 355, §5 (AMD).

**§86-A. Jurisdiction over coastal waters and rivers**

This subchapter applies to all Maine coastal waters and navigable waters with the exception of:
[PL 1987, c. 689, §1 (RPR).]

**l. Piscataqua River.** The Piscataqua River;
[PL 1987, c. 689, §1 (RPR).]

**2. Exempt waters.** Those waters specifically exempted by the Maine Pilotage Commission; or
[PL 1999, c. 355, §6 (AMD).]

**3. Portland harbor.** Those waters specifically governed by the Board of Harbor Commissioners for the Harbor of Portland.
[PL 1987, c. 689, §1 (RPR).]

**4. Frenchman's Bay.**
[PL 1987, c. 689, §1 (RP).]

**5. Eastport Harbor, Cobscook Bay, Penamquan River and Friar Roads.**
[PL 1987, c. 689, §1 (RP).]

SECTION HISTORY

PL 1985, c. 389, §33 (NEW). PL 1987, c. 689, §1 (RPR). PL 1999, c. 355, §6 (AMD).

**§87. Vessels exempt**

**(REPEALED)**

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1985, c. 389, §34 (RP).

**§87-A. Exceptions**

**1. Vessels exempt.** This subchapter does not apply to:

A. Vessels under enrollment; [PL 1985, c. 389, §35 (NEW).]

B. Fishing vessels; [PL 1985, c. 389, §35 (NEW).]

C. Vessels powered predominantly by sail; [PL 1999, c. 355, §7 (AMD).]

D.   [PL 2011, c. 498, §1 (RP).]

E.  All military ships navigating the Kennebec River to and from the Bath Iron Works Corporation for the purpose of accomplishing overhaul, repair, post shakedown availability and sea trials; and [PL 2011, c. 14, §2 (AMD).]

F.  Noncommercial foreign vessels with overall length of under 253 feet.  [PL 2015, c. 14, §1 (AMD).]
[PL 2015, c. 14, §1 (AMD).]

**2.  Limitation.**  If any such vessel employs a pilot, the pilot is entitled to receive as compensation for that pilot's service pilotage fees in the amount established by the commission.
[PL 1999, c. 355, §7 (AMD).]

SECTION HISTORY

PL 1985, c. 389, §35 (NEW). PL 1999, c. 355, §7 (AMD). PL 2011, c. 14, §§1-3 (AMD). PL 2011, c. 498, §1 (AMD). PL 2015, c. 14, §1 (AMD).

**§88.  Piloting without license**

It is unlawful for any person not licensed as a pilot under this subchapter to pilot or offer to pilot a vessel not exempt from this subchapter.  Any person found to be in violation of this subchapter must be assessed a fine not to exceed $5,000 for each instance of piloting, or offering to pilot without a license.  Violation of this provision is a Class E crime.  [PL 1999, c. 355, §8 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 696, §332 (AMD). PL 1999, c. 355, §8 (AMD).

**§89.  Maine Pilotage Commission members**

The Maine Pilotage Commission, as established by Title 5, section 12004-A, subsection 40, consists of 7 members who are citizens of the United States and the State of Maine appointed by the Governor as follows:   Three licensed pilots who are actively piloting, one member from each of the coastal zones; 2 members who are not licensed pilots but are from a maritime industry that utilizes the services of pilots; and 2 members representing the public who are not licensed pilots but have a maritime background.  Appointments are for 3-year terms.  Appointments of members must comply with Title 10, section 8009.  The members of the commission are entitled to compensation according to Title 5, chapter 379.  [PL 2007, c. 695, Pt. B, §23 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1975, c. 771, §415 (AMD). PL 1983, c. 812, §288 (AMD). PL 1985, c. 389, §36 (RPR). PL 1989, c. 503, §B174 (AMD). PL 1993, c. 600, §A281 (AMD). PL 1999, c. 355, §9 (AMD). PL 2007, c. 695, Pt. B, §23 (AMD).

**§90.  Duties of commission**

**1.  Duties.**  The commission shall perform the duties set forth and such other duties as may be provided by law:

A.  Make, establish and enforce such rules and regulations not inconsistent with law that are binding upon all pilots licensed by the commission, and upon all parties employing such pilots;  [PL 1999, c. 355, §10 (AMD).]

B.  Make and establish rates of pilotage for those vessels that are subject to this subchapter;  [PL 1999, c. 355, §10 (AMD).]

C.  Establish and determine the qualifications of any person applying for a pilot's license and conduct examinations;  [PL 1969, c. 410, §1 (NEW).]

D.  Issue any pilot's license in accordance with this subchapter and initiate proceedings to suspend or revoke these licenses;  [PL 1999, c. 355, §11 (AMD).]

E.  Cause the laws, rules and regulations concerning pilots and pilotage matters to be fully observed and executed;  [PL 1969, c. 410, §1 (NEW).]

F.  Hear and decide complaints made in writing or initiated on its own motion against any pilot for any misbehavior, neglect of, or breach of rules or regulations that it determines material to be investigated;  [PL 1999, c. 355, §12 (AMD).]

G.  Hear and decide complaints made in writing by any pilot against any charterer, owner, agent, master or crew member of a vessel for any misbehavior toward such pilot in the performance of the charterer's, owner's, agent's, master's or crew member's duty, or any breach of the rules and regulations;  [RR 2021, c. 2, Pt. B, §227 (COR).]

H.    [PL 1991, c. 837, Pt. A, §79 (RP).]

I.  To do all other things reasonable, necessary and expedient to insure proper and safe pilotage and to facilitate the efficient administration of this subchapter.  [PL 1999, c. 355, Pt. B, §12 (AMD).]
[RR 2021, c. 2, Pt. B, §227 (COR).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 694, §747 (AMD). PL 1985, c. 389, §37 (AMD). PL 1991, c. 837, §A79 (AMD). PL 1999, c. 355, §§10-12 (AMD). RR 2021, c. 2, Pt. B, §227 (COR).

### §90-A.  Reports; liaison; limitations

On or before August 1st of each year, the commission shall submit to the commissioner for the preceding fiscal year ending June 30th its annual report of its operations and financial position, together with those comments and recommendations that the commission considers essential.  [PL 1999, c. 355, §13 (AMD).]

SECTION HISTORY

PL 1977, c. 604, §42 (NEW). PL 1981, c. 456, §A121 (AMD). PL 1983, c. 758, §14 (AMD). PL 1999, c. 355, §13 (AMD).

### §90-B.  Budget

The commission's budget must be prepared and submitted to the commissioner for approval.  [PL 1997, c. 727, Pt. C, §18 (AMD).]

SECTION HISTORY

PL 1977, c. 604, §42 (NEW). PL 1981, c. 456, §A122 (AMD). PL 1983, c. 758, §15 (AMD). PL 1995, c. 397, §125 (RPR). PL 1997, c. 727, §C18 (AMD).

### §90-C.  Employees

The commissioner may appoint employees as necessary.  [PL 1997, c. 727, Pt. C, §19 (AMD).]

SECTION HISTORY

PL 1983, c. 758, §16 (NEW). PL 1995, c. 397, §126 (NEW). PL 1997, c. 727, §C19 (AMD).

### §91.  Qualifications of licensees

Every person who applies for a license to act as a pilot in the waters covered in this subchapter must be a citizen of the United States and the State of Maine. If applicable, the applicant must possess a federal first class pilot's endorsement, issued by a duly constituted authority of the United States, covering areas for which the applicant is making application.  The commission shall set standards for

application, testing and granting of a state license. In those areas where no federal endorsement is available, the commission may set additional standards for a state license. An applicant for a license must satisfy the commission that the applicant has or will have proper means available for boarding and leaving vessels which the applicant may be called upon to pilot. [PL 1999, c. 355, §14 (AMD).]

An applicant must complete a training trip in the area for which that person is making application under the direction of a licensed pilot actively piloting in that area. These training trips must be on vessels of at least 1600 gross tons. The commission shall establish standards for proof of such training and the minimum number of trips required. Once those standards are established, they may be amended only upon a 2/3 vote of the commission. [PL 1999, c. 355, §14 (NEW).]

Notwithstanding the training trip requirements under this section, the commission may establish alternative requirements for pilots under the jurisdiction of the commission who are seeking route endorsements in areas of low traffic volume as defined by the commission. The commission shall adopt rules implementing any alternative initial license criteria for pilots seeking route endorsements in areas of low traffic volume that are established by the commission. Rules adopted pursuant to this paragraph are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A. [PL 2019, c. 663, §1 (NEW).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1985, c. 389, §38 (AMD). PL 1999, c. 355, §14 (AMD). PL 2019, c. 663, §1 (AMD).

**§92. Duration and renewal of licenses**

Licenses issued by the pilotage commission must be renewed every 5 years to coincide, if possible, with the renewal of the individual's federal license. [PL 1999, c. 355, §15 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1983, c. 758, §17 (AMD). PL 1991, c. 509, §47 (AMD). PL 1999, c. 355, §15 (AMD).

**§93. License fees**

Every new application for a license to act as a pilot on coastal waters must be accompanied by an application fee of $500 for the first pilotage area and $50 for each successive pilotage area. Original and renewal license fees are $375 for 5 years, regardless of number of areas being renewed. Licenses may be renewed up to 90 days after the date of expiration upon payment of a late fee of $100 in addition to the renewal fee. Any person who submits an application for renewal more than 90 days after the licensing renewal date is subject to all requirements governing new applicants under this chapter. [PL 1999, c. 355, §16 (AMD).]

A holder of a license on the effective date of this paragraph is not required to renew that license until the next expiration and renewal of the federal license. [PL 1999, c. 355, §16 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1991, c. 509, §48 (AMD). PL 1999, c. 355, §16 (AMD).

**§94. Accounts of fees; payments to commission**

**(REPEALED)**

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1991, c. 509, §49 (AMD). PL 1999, c. 355, §17 (RP).

**§95. Pilot's bond**

**(REPEALED)**

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1991, c. 509, §50 (RP).

### §96. Lawful compensation

No pilot shall demand or receive any greater, lesser or different compensation for piloting a vessel upon any of the pilotage grounds than is allowed by law.  [PL 1969, c. 410, §1 (NEW).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW).

### §97. Authority of pilots

A pilot licensed under this subchapter may pilot any vessel required to take a state pilot anywhere upon the pilotage area for which the pilot is licensed.  [PL 1999, c. 355, §18 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1999, c. 355, §18 (AMD).

### §98. Commissions prohibited

A master, agent, owner, charterer or consignee may not charge a commission or receive any payment directly or indirectly, for the assignment of pilotage, nor may any pilot pay or offer to pay to any person any commission for the assignment of pilotage. Any person violating this section commits a civil violation for which a forfeiture not to exceed $5,000 may be adjudged for each violation.  [PL 1999, c. 355, §19 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 696, §333 (AMD). PL 1999, c. 355, §19 (AMD).

### §99. Grounds for disciplinary action

The commission may suspend any pilot for any period that it may consider proper and may suspend, revoke or annul any pilot's license that is issued under this subchapter, upon satisfactory proof that a pilot has willfully disobeyed or violated any of the provisions of this subchapter or any rule established by the commission; or a pilot has negligently lost or damaged any vessel under that pilot's care; or a pilot is habitually intemperate in the use of alcohol or habitually uses narcotic or hypnotic or other substances so  as to be unfit to be entrusted with the charge of a vessel; or the pilot is so mentally or physically incapable as to be unfit to carry on the duties of a pilot.  [PL 1999, c. 355, §20 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 694, §748 (AMD). PL 1985, c. 389, §39 (AMD). PL 1999, c. 355, §20 (AMD).

### §99-A. Pilot liability

**1. Acts or omissions of another pilot; no liability.**  A pilot is not liable directly or as a member of an organization of pilots for a claim that arises from an act or omission of another pilot or organization of pilots or that relates directly or indirectly to pilot services.
[PL 1999, c. 355, §21 (NEW).]

**2. Limitation on liability.**  A pilot providing pilot services is not liable for more than $5,000 in damages or loss caused by any negligent act or omission in the performance of pilot services.  A pilot providing piloting services is liable for:

A. Damages or loss arising from the intentional, willful or reckless misconduct of the pilot; or  [PL 1999, c. 355, §21 (NEW).]

B.  Liability for exemplary damages for intentional, willful or reckless conduct of the pilot for which no other person is jointly or severally liable.  [PL 1999, c. 355, §21 (NEW).]
[RR 1999, c. 1, §52 (COR).]

Nothing in this section may be construed to exempt an owner or operator of a vessel from liability for damage or loss caused by that vessel.  [RR 1999, c. 1, §52 (COR).]

SECTION HISTORY

RR 1999, c. 1, §52 (COR). PL 1999, c. 355, §21 (NEW).

§100.  Notice of hearing on complaint

Before any person may be proceeded against on any complaint, such person or pilot must be notified in writing to appear before the commission. Such notice must specify the nature and substance of such complaint and be served personally or by certified mail addressed to such pilot at the pilot's last and usual place of abode at least 15 days before the time fixed in the notice for the pilot's appearance. [RR 2021, c. 2, Pt. B, §228 (COR).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 694, §749 (AMD). RR 2021, c. 2, Pt. B, §228 (COR).

§100-A.  Confidentiality of complaints and investigative records

**1.  During investigation.**  All complaints and investigative records of the commission are confidential during the pendency of an investigation.  Those records become public records upon the conclusion of an investigation unless confidentiality is required by some other provision of law.  For purposes of this section, an investigation is concluded when:

A.  A notice of an adjudicatory hearing under Title 5, chapter 375, subchapter IV has been issued; [PL 1999, c. 355, §22 (NEW).]

B.  The complaint has been listed on a meeting agenda of the commission;  [PL 1999, c. 355, §22 (NEW).]

C.  A consent agreement has been executed; or  [PL 1999, c. 355, §22 (NEW).]

D.  A letter of dismissal has been issued or the investigation has otherwise been closed.  [PL 1999, c. 355, §22 (NEW).]
[PL 1999, c. 355, §22 (NEW).]

**2.  Exceptions.**  Notwithstanding subsection 1, during the pendency of an investigation, a complaint or investigative record may be disclosed:

A.  To department employees designated by the commissioner;  [PL 1999, c. 355, §22 (NEW).]

B.  To designated complaint officers of the commission;  [PL 1999, c. 355, §22 (NEW).]

C.  By a department employee or complaint officer designated by the commissioner when and to the extent considered necessary to facilitate the investigation;  [PL 1999, c. 355, §22 (NEW).]

D.  To other state or federal agencies when the files contain evidence of possible violations of laws enforced by those agencies;  [PL 1999, c. 355, §22 (NEW).]

E.  When and to the extent considered necessary by the commissioner to avoid imminent and serious harm.  The authority of the commissioner to make such a disclosure may not be delegated; [PL 1999, c. 355, §22 (NEW).]

F.  Pursuant to rules adopted by the department, when it is determined that confidentiality is no longer warranted due to general public knowledge of the circumstances surrounding the complaint or investigation and when the investigation would not be prejudiced by the disclosure; and  [PL 1999, c. 355, §22 (NEW).]

G.  To the person investigated on that person's request.  The commissioner may refuse to disclose part or all of any investigative information, including the fact of an investigation, when the commissioner determines that disclosure would prejudice the investigation.  The authority of the commissioner to make such a determination may not be delegated.  [RR 1999, c. 1, §53 (COR).]
[RR 1999, c. 1, §53 (COR).]

**3.  Violation.**  A person who knowingly or intentionally makes a disclosure in violation of this section commits a civil violation for which a forfeiture not to exceed $1,000 may be adjudged.
[PL 1999, c. 355, §22 (NEW).]

SECTION HISTORY

RR 1999, c. 1, §53 (COR). PL 1999, c. 355, §22 (NEW).

**§101.  Surrender of revoked or suspended license**

**1.  Surrender of revoked or suspended license.**  A pilot whose license has been revoked or suspended shall surrender the license to the commission, which shall retain it until the period of the pilot's suspension expires.  A pilot whose license has been revoked or suspended who refuses to surrender the license on demand commits a civil violation for which a fine of not more than $5,000 for each week after the demand that the pilot refuses to surrender the license may be adjudged.
[PL 2003, c. 452, Pt. W, §1 (NEW); PL 2003, c. 452, Pt. X, §2 (AFF).]

**2.  Continuing to pilot after revocation or suspension.**  A pilot whose license has been revoked or suspended who continues to pilot commits a civil violation for which a fine of not more than $5,000 for each vessel piloted without a license may be adjudged.
[PL 2003, c. 452, Pt. W, §1 (NEW); PL 2003, c. 452, Pt. X, §2 (AFF).]

**3.  Publication.**  The commission may cause to be published in a newspaper of general circulation published in the State a notice that that person has no authority to act as a pilot unless and until reinstated by law.
[PL 2003, c. 452, Pt. W, §1 (NEW); PL 2003, c. 452, Pt. X, §2 (AFF).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1977, c. 696, §334 (RPR). PL 1999, c. 355, §23 (AMD). PL 2003, c. 452, §W1 (RPR). PL 2003, c. 452, §X2 (AFF).

**§102.  Reinstatement following suspension**

Any pilot whose license has been suspended is, following the expiration of the period of the suspension, entitled to the reinstatement of the pilot's license, as long as the pilot possesses the qualifications required of pilots as of the time the pilot's suspension expires.  [RR 2021, c. 2, Pt. B, §229 (COR).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). RR 2021, c. 2, Pt. B, §229 (COR).

**§103.  Lapsed**

Any pilot heretofore licensed by the commission whose license lapses for any reason may be reinstated upon compliance with sections 91 and 93, as if applying for an initial license.  [PL 1999, c. 355, §24 (AMD).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1999, c. 355, §24 (AMD).

**§104.  Appeals from commission**

Any person aggrieved by any final order or decision of the commission with respect to any disciplinary action or any application for, or denial of, a pilot's license may appeal therefrom to the Superior Court in accordance with the Maine Administrative Procedure Act.  [PL 1977, c. 694, §750 (RPR).]

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1973, c. 303, §3 (AMD). PL 1977, c. 694, §750 (RPR).

**§105.  Pilots currently serving**

**(REPEALED)**

SECTION HISTORY

PL 1969, c. 410, §1 (NEW). PL 1979, c. 127, §206 (AMD). PL 1999, c. 355, §25 (RP).

**§106.  Disposition of fees**

All money received by the commission must be paid to the Treasurer of State and credited to the account for the commission within the budget of the Department of Transportation.  [PL 1997, c. 727, Pt. C, §20 (AMD).]

Money received by the commission must be used for the expenses of administering its statutory responsibilities, including, but not limited to, the costs of conducting investigations, taking testimony and procuring the attendance of witnesses, the costs of all legal proceedings initiated for enforcement and administrative expenses.  [PL 1995, c. 397, §127 (NEW).]

Any balance of these fees may not lapse but must be carried forward as a continuing account to be expended for the same purposes in the following fiscal years.  [PL 1995, c. 397, §127 (NEW).]

SECTION HISTORY

PL 1985, c. 389, §40 (NEW). PL 1995, c. 397, §127 (RPR). PL 1995, c. 502, §H48 (AMD). PL 1997, c. 727, §C20 (AMD).

## SUBCHAPTER 4

## LIGHTERS AND HARBORS

### §121.  Marking; inspection and renewal

Every boat or lighter employed in carrying stones, sand or gravel shall be marked at light-water mark, and at least 5 other places, with the figures 4, 12, 16, 24 and 30, legibly made on the stem and sternpost thereof, expressing the weight which such boat or lighter is capable of carrying, when the lower part of the respective numbers touches the water in which it floats. Such marks shall be inspected yearly, and when found illegible in whole or in part, they shall be renewed.

### §122.  Use without marks or false marks; penalty

A master or owner who uses the master's or owner's craft without such marks prescribed in section 121 and any person who falsely marks any such boat or lighter forfeits $50 to be recovered by any prosecutor in a civil action.  [RR 2021, c. 2, Pt. B, §230 (COR).]

SECTION HISTORY

RR 2021, c. 2, Pt. B, §230 (COR).

### §123.  Appointment of inspectors; fees; remarking of boats

The municipal officers of every town where boats and lighters are employed for the purposes set forth in section 121 shall annually, in April or May, appoint some suitable person to be sworn to

# LAWS

OF THE

# STATE OF MAINE

AS PASSED BY THE

## ONE HUNDRED AND TWELFTH LEGISLATURE

**FIRST REGULAR SESSION**
December 5, 1984 to June 20, 1985
Chapters 384-End

AND AT THE

**FIRST SPECIAL SESSION**
November 13, 1985

PUBLISHED BY THE DIRECTOR OF REVISOR OF STATUTES IN
ACCORDANCE WITH MAINE REVISED STATUTES ANNOTATED,
TITLE 3, SECTION 163-A, SUBSECTION 4.

J.S. McCarthy Co., Inc.
Augusta, Maine
1985

# PUBLIC LAWS

OF THE

# STATE OF MAINE

AS PASSED AT THE

FIRST REGULAR SESSION

CONTINUED

and

FIRST SPECIAL SESSION

of the

ONE HUNDRED AND TWELFTH LEGISLATURE

1985

§789.  Human Rights Commission

All affirmative action programs, whether part of the civil service or not, shall be subject to the review and comment of the Human Rights Commission.

All powers and duties granted to the Maine Human Rights Commission under sections 4551, et seq., as amended, apply to this section. Complaints of discrimination based on race, color, religious creed, sex, national origin, age er, physical handicap or mental handicap should be made to the Maine Human Rights Commission.

Effective September 19, 1985.

# CHAPTER 389

### S.P. 556 - L.D. 1502

## AN ACT Affecting the Statutes of Agencies within the Department of Business, Occupational and Professional Regulation.

Be it enacted by the People of the State of Maine as follows:

Sec. 1.  5 MRSA §12004, sub-§1, ¶A, as amended by PL 1983, c. 862, §§17 to 19, is further amended to read:

A. This classification includes the following boards:

| | NAME OF ORGANIZATION | RATE OF COMPENSATION | STATUTORY REFERENCE |
|---|---|---|---|
| (1) | Board of Accountancy | $35/Day | 32 MRSA §3971 |
| (2) | Arborist Examining Board | $25/Day | 32 MRSA §2001 |
| (3) | Maine State Board for Registration of Architects and Landscape Architects | $35/Day | 32 MRSA §211 |
| (4) | Board of Examiners of Applicants for Admission to the Bar | Legislative Per Diem | 4 MRSA §801 |

Sec. 33.  38 MRSA §86-A is enacted to read:

§86-A.  Jurisdiction over coastal waters and rivers

This subchapter applies to the following de-scribed coastal waters and rivers:

1.  Seguin Island to Bath.  Seguin Island to Bath via Kennebec River;

2.  Penobscot Bay.  Penobscot Bay north of a line drawn from Marshall Point Light to Port Clyde, thence to Matinicus Rock Light, thence to Western Head  Isle au Haut;

3.  Penobscot  River.  Penobscot River from Fort Point Light to Bangor;

4.  Frenchman's Bay.  Frenchman's Bay landward of a line drawn from Schoodic Point to Otter Point;  and

5.  Eastport Harbor, Cobscook Bay, Penamquan Riv-er and Friar Roads.  Eastport Harbor, Cobscook Bay, Penamquan River and Friar Roads via Head Harbor  pas-sage.

Sec. 34.  38  MRSA §87, as enacted by PL 1969, c. 410, §1, is repealed.

Sec. 35.  38 MRSA §87-A is enacted to read:

§87-A.  Exceptions

1.  Vessels exempt.  Sections 85 to 106 shall not apply to:

A.  Vessels under enrollment;

B.  Fishing vessels;

C.  Vessels powered by sail;

D.  The motor vessel Bluenose, or any vessel sub-stituted for the Bluenose, operating on a  pub-lished  regular schedule sailing between Bar Har-bor, Maine, and Yarmouth, Nova  Scotia,  provided that:

(1)  The  qualifications  and  experience of any licensed master of the Bluenose, or  its substitute,  meet those established by regu-lations of the United States Coast Guard;

account to be expended for the same purposes in the following fiscal years.

<div align="center">Effective September 19, 1985.</div>

# CHAPTER 390

<div align="center">H.P. 773 - L.D. 1094</div>

<div align="center">AN ACT to Regulate Membership Camping.</div>

**Emergency preamble.** Whereas, Acts of the Legislature do not become effective until 90 days after adjournment unless enacted as emergencies; and

Whereas, sales of membership camping contracts have recently grown tremendously and are anticipated to expand even further with the addition of at least one new membership camping operator for this coming "summer season"; and

Whereas, currently there is no regulation to protect consumers against the tremendous risk of abuse associated with the sales' practices used by this industry which are similar to those used in the sale of condominiums and time-share units; and

Whereas, without the benefit of this legislation for the coming "summer season" many consumers may become victims of the high pressure sales' tactics and misrepresentations used by some elements of the membership camping industry; and

Whereas, in the judgment of the Legislature, these facts create an emergency with the meaning of the Constitution of Maine and require the following legislation as immediately necessary for the preservation of the public peace, health and safety; now, therefore,

Be it enacted by the People of the State of Maine as follows:

33 MRSA c. 10, sub-c.I-A is enacted to read:

<div align="center">SUBCHAPTER I-A</div>

<div align="center">MEMBERSHIP CAMPING</div>

§589. Definitions

the requested waiver. The Commandant (CG-5P) may grant, in writing, a waiver with or without conditions only if the waiver will not reduce the overall security of the facility, its employees, visiting vessels, or ports.

[USCG–2003–14732, 68 FR 39322, July 1, 2003; 68 FR 41916, July 16, 2003; USCG–2008–0179, 73 FR 35009, June 19, 2008; USCG–2010–0351, 75 FR 36282, June 25, 2010; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2014–0410, 79 FR 38432, July 7, 2014]

### § 105.135 Equivalents.

For any measure required by this part, the facility owner or operator may propose an equivalent as provided in § 101.130 of this subchapter.

### § 105.140 Alternative Security Program.

(a) A facility owner or operator may use an Alternative Security Program approved under § 101.120 of this subchapter if:

(1) The Alternative Security Program is appropriate to that facility;

(2) The Alternative Security Program is implemented in its entirety.

(b) A facility owner or operator using an Alternative Security Program approved under § 101.120 of this subchapter must complete and submit to the cognizant COTP a Facility Vulnerability and Security Measures Summary (Form CG–6025). The form is available at *https://www.dcms.uscg.mil/forms/*.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended by USCG–2020–0304, 85 FR 58278, Sept. 18, 2020]

### § 105.145 Maritime Security (MARSEC) Directive.

Each facility owner or operator subject to this part must comply with any instructions contained in a MARSEC Directive issued under § 101.405 of this subchapter.

### § 105.150 Right to appeal.

Any person directly affected by a decision or action taken under this part, by or on behalf of the Coast Guard, may appeal as described in § 101.420 of this subchapter.

## Subpart B—Facility Security Requirements

### § 105.200 Owner or operator.

(a) Each facility owner or operator must ensure that the facility operates in compliance with the requirements of this part.

(b) For each facility, the facility owner or operator must—

(1) Define the organizational structure of the security personnel and provide each person exercising security duties and responsibilities the support needed to fulfill those obligations;

(2) Designate, in writing, by name or by title, a Facility Security Officer (FSO) and identify how the officer can be contacted at any time;

(3) Ensure that a Facility Security Assessment (FSA) is conducted;

(4) Ensure the development and submission for approval of a Facility Security Plan (FSP);

(5) Ensure that the facility operates in compliance with the approved FSP;

(6) Ensure that the Transportation Worker Identification Credential (TWIC) program is properly implemented as set forth in this subchapter, including—

(i) Ensuring that only individuals who hold a TWIC and are authorized to be in the secure area in accordance with the FSP are permitted to serve as an escort;

(ii) Identifying what action is to be taken by an escort, or other authorized individual, in the event that individuals under escort engage in activities other than those for which escorted access was granted; and

(iii) Notifying facility employees, and passengers if applicable, of which parts of the facility are secure areas and which are public access areas, as applicable, and ensuring such areas are clearly marked.

(7) Ensure that restricted areas are controlled and TWIC provisions are coordinated, if applied to such restricted areas;

(8) Ensure that adequate coordination of security issues takes place between the facility and vessels that call on it, including the execution of a Declaration of Security (DoS) as required by this part;

(9) Ensure implementation of a system, in accordance with § 105.237, coordinating shore leave for vessel personnel or crew change-out, as well as access through the facility for visitors to the vessel, as described in § 105.237(b)(3), with vessel operators in advance of a vessel's arrival. In coordinating such leave, facility owners or operators may refer to treaties of friendship, commerce, and navigation between the U.S. and other nations;

(10) Ensure, within 12 hours of notification of an increase in MARSEC Level, implementation of the additional security measures required for the new MARSEC Level;

(11) Ensure security for unattended vessels moored at the facility;

(12) Ensure the report of all breaches of security and transportation security incidents to the National Response Center in accordance with part 101 of this chapter;

(13) Ensure consistency between security requirements and safety requirements;

(14) Inform facility personnel of their responsibility to apply for and maintain a TWIC, including the deadlines and methods for such applications, and of their obligation to inform Transportation Security Administration (TSA) of any event that would render them ineligible for a TWIC, or which would invalidate their existing TWIC;

(15) Ensure that protocols consistent with § 101.550 of this subchapter, for dealing with individuals requiring access who report a lost, damaged, or stolen TWIC, or who have applied for and not yet received a TWIC, are in place; and

(16) If applicable, ensure that protocols consistent with § 105.257, for dealing with newly hired employees who have applied for and not yet received a TWIC, are in place.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended at 68 FR 60541, Oct. 22, 2003; USCG–2006–24196, 72 FR 3582, Jan. 25, 2007; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2007–28915, 81 FR 57712, Aug. 23, 2016; USCG–2013–1087, 84 FR 12119, Apr. 1, 2019]

**§ 105.205 Facility Security Officer (FSO).**

(a) *General.* (1) The FSO may perform other duties within the owner's or operator's organization, provided he or she is able to perform the duties and responsibilities required of the FSO.

(2) The same person may serve as the FSO for more than one facility, provided the facilities are in the same COTP zone and are not more than 50 miles apart. If a person serves as the FSO for more than one facility, the name of each facility for which he or she is the FSO must be listed in the Facility Security Plan (FSP) of each facility for which or she is the FSO.

(3) The FSO may assign security duties to other facility personnel; however, the FSO retains the responsibility for these duties.

(4) The FSO must maintain a TWIC.

(b) *Qualifications.* (1) The FSO must have general knowledge, through training or equivalent job experience, in the following:

(i) Security organization of the facility;

(ii) General vessel and facility operations and conditions;

(iii) Vessel and facility security measures, including the meaning and the requirements of the different MARSEC Levels;

(iv) Emergency preparedness, response, and contingency planning;

(v) Security equipment and systems, and their operational limitations; and

(vi) Methods of conducting audits, inspections, control, and monitoring techniques.

(2) In addition to knowledge and training required in paragraph (b)(1) of this section, the FSO must have knowledge of and receive training in the following, as appropriate:

(i) Relevant international laws and codes, and recommendations;

(ii) Relevant government legislation and regulations;

(iii) Responsibilities and functions of local, State, and Federal law enforcement agencies;

(iv) Security assessment methodology;

(v) Methods of facility security surveys and inspections;

(vi) Instruction techniques for security training and education, including security measures and procedures;

(vii) Handling sensitive security information and security related communications;

407



(e) At MARSEC Level 3, in addition to the requirements in this part, a facility owner or operator may be required to implement additional measures, pursuant to 33 CFR part 6, 160, or 165, as appropriate, which may include but are not limited to:

(1) Use of waterborne security patrol;

(2) Use of armed security personnel to control access to the facility and to deter, to the maximum extent practical, a transportation security incident; and

(3) Examination of piers, wharves, and similar structures at the facility for the presence of dangerous substances or devices underwater or other threats.

## § 105.235 Communications.

(a) The Facility Security Officer must have a means to effectively notify facility personnel of changes in security conditions at the facility.

(b) Communication systems and procedures must allow effective and continuous communications between the facility security personnel, vessels interfacing with the facility, the cognizant COTP, and national and local authorities with security responsibilities.

(c) At each active facility access point, provide a means of contacting police, security control, or an emergency operations center, by telephones, cellular phones, and/or portable radios, or other equivalent means.

(d) Facility communications systems must have a backup means for both internal and external communications.

## § 105.237 System for seafarers' access.

(a) *Access required.* Each facility owner or operator must implement a system by June 1, 2020 for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section. The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered. The system must comply with the Transportation Worker Identification

Credential (TWIC) provisions in this part.

(b) *Individuals covered.* The individuals to whom the facility owner or operator must provide the access described in this section include—

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

(c) *Timely access.* The facility owner or operator must provide the access described in this section without unreasonable delay, subject to review by the Captain of the Port (COTP). The facility owner or operator must consider the following when establishing timely access without unreasonable delay:

(1) Length of time the vessel is in port.

(2) Distance of egress/ingress between the vessel and facility gate.

(3) The vessel watch schedules.

(4) The facility's safety and security procedures as required by law.

(5) Any other factors specific to the vessel or facility that could affect access to and from the vessel.

(d) *Access methods.* The facility owner or operator must ensure that the access described in this section is provided through one or more of the following methods:

(1) Regularly scheduled escort between the vessel and the facility gate that conforms to the vessel's watch schedule as agreed upon between the vessel and facility.

(2) An on-call escort between the vessel and the facility gate.

(3) Arrangements with taxi services or other transportation services, ensuring that any costs for providing the access described in this section, above the service's standard fees charged to any customer, are not charged to the individual to whom such access is provided. If a facility provides arrangements with taxi services or other transportation services as the only method for providing the access described in this section, the facility is responsible to pay any fees for transit within the facility.

(4) Arrangements with seafarers' welfare organizations to facilitate the access described in this section.

411

(5) Monitored pedestrian access routes between the vessel and facility gate.

(6) A method, other than those in paragraphs (d)(1) through (5) of this section, approved by the COTP.

(7) If an access method relies on a third party, a back-up access method that will be used if the third party is unable to or does not provide the required access in any instance. An owner or operator must ensure that the access required in paragraph (a) of this section is actually provided in all instances.

(e) *No cost to individuals.* The facility owner or operator must provide the access described in this section at no cost to the individual to whom such access is provided.

(f) *Described in the Facility Security Plan (FSP).* On or before February 3, 2020, the facility owner or operator must document the facility's system for providing the access described in this section in the approved FSP in accordance with § 105.410 or § 105.415. The description of the facility's system must include—

(1) Location of transit area(s) used for providing the access described in this section;

(2) Duties and number of facility personnel assigned to each duty associated with providing the access described in this section;

(3) Methods of escorting and/or monitoring individuals transiting through the facility;

(4) Agreements or arrangements between the facility and private parties, nonprofit organizations, or other parties, to facilitate the access described in this section; and

(5) Maximum length of time an individual would wait for the access described in this section, based on the provided access method(s).

[USCG-2013-1087, 84 FR 12119, Apr. 1, 2019]

## § 105.240 Procedures for interfacing with vessels.

The facility owner or operator must ensure that there are measures for interfacing with vessels at all MARSEC Levels.

## § 105.245 Declaration of Security (DoS).

(a) Each facility owner or operator must ensure procedures are established for requesting a DoS and for handling DoS requests from a vessel.

(b) At MARSEC Level 1, a facility receiving a cruise ship or a manned vessel carrying Certain Dangerous Cargo, in bulk, must comply with the following:

(1) Prior to the arrival of a vessel to the facility, the Facility Security Officer (FSO) and Master, Vessel Security Officer (VSO), or their designated representatives must coordinate security needs and procedures, and agree upon the contents of the DoS for the period of time the vessel is at the facility; and

(2) Upon the arrival of the vessel at the facility, the FSO and Master, VSO, or their designated representative, must sign the written DoS.

(c) Neither the facility nor the vessel may embark or disembark passengers, nor transfer cargo or vessel stores until the DoS has been signed and implemented.

(d) At MARSEC Levels 2 and 3, the FSOs, or their designated representatives, of facilities interfacing with manned vessels subject to part 104, of this subchapter must sign and implement DoSs as required in (b)(1) and (2) of this section.

(e) At MARSEC Levels 1 and 2, FSOs of facilities that frequently interface with the same vessel may implement a continuing DoS for multiple visits, provided that:

(1) The DoS is valid for a specific MARSEC Level;

(2) The effective period at MARSEC Level 1 does not exceed 90 days; and

(3) The effective period at MARSEC Level 2 does not exceed 30 days.

(f) When the MARSEC Level increases beyond that contained in the DoS, the continuing DoS is void and a new DoS must be executed in accordance with this section.

(g) A copy of all currently valid continuing DoSs must be kept with the Facility Security Plan.

(h) The COTP may require, at any time, at any MARSEC Level, any facility subject to this part to implement a DoS with the VSO prior to any vessel-

412



# SUBCHAPTER I—ANCHORAGES

## PART 109—GENERAL

Sec.
109.01  Purpose.
109.05  Anchorage grounds.
109.07  Anchorages under Ports and Waterways Safety Act.
109.10  Special anchorage areas.
109.15  Enforcement proceedings.
109.20  Publication; notice of proposed rule making.

AUTHORITY: 33 U.S.C. 471; 46 U.S.C. 70034; Public Law 107–296, 116 Stat. 2135; Department of Homeland Security Delegation No. 0170.1.

### § 109.01  Purpose.

The purpose of the rules and regulations in this subchapter is to implement certain laws and set forth the requirements for anchorage areas.

[CGFR 67–46, 32 FR 17727, Dec. 12, 1967, as amended by CGD 79–096, 44 FR 51585, Sept. 4, 1979; USCG–1998–3799, 63 FR 35526, June 30, 1998]

### § 109.05  Anchorage grounds.

(a) Section 7 of the Rivers and Harbors Act of March 4, 1915 (33 U.S.C. 471), authorizes the establishment of anchorage grounds for vessels in navigable waters of the United States whenever it is apparent that these are required by the maritime or commercial interests of the United States for safe navigation. The statute also authorizes the adoption of suitable rules and regulations regarding the establishment of anchorage grounds, which are enforced by the Coast Guard. The authority conferred by this statute was transferred to and vested in the Secretary of Homeland Security by section 902(j) of the Coast Guard and Maritime Transportation Act of 2006 (Pub. L. 109–241, 120 Stat. 516), and delegated to the Commandant of the U.S. Coast Guard in Department of Homeland Security Delegation No. 0170.1. The Commandant redelegated the authority to establish anchorage grounds to each Coast Guard District Commander as provided in 33 CFR 1.05–1(e)(1)(i).

(b) District Commanders will, whenever matters relating to the anchorage of vessels are under consideration, ascertain the view of the District and Division Engineer, Corps of Engineers, U.S. Army, and the proper representatives of other departments likely to be interested, including the Commandant of the Naval District concerned and the medical officer in charge of the quarantine station at localities where quarantine anchorages are involved, in order that they may arrange for suitable representation at such hearings. The views of the medical officer in charge of the quarantine station relating to the proposed location and boundaries of the quarantine anchorage will be accepted insofar as practicable and consistent with the establishment of other anchorage areas. (An Act of Congress approved July 1, 1944, as amended (42 U.S.C. 267), authorizes the Surgeon General, with the approval of the Secretary of Health, Education, and Welfare, to designate the boundaries of the quarantine grounds and quarantine anchorages for vessels which are reserved for use at each United States quarantine station.) A notice of public hearing concerning changes to the Anchorage Regulations will be issued by the District Commander and will be mailed to all known interested parties. After providing an opportunity for public participation, the District Commander will, if circumstances so warrant, issue changes to the Anchorage Regulations, or in appropriate cases forward recommendations for such changes to the Commandant.

(c) As soon as publication has been noted in the FEDERAL REGISTER, the District Commander will publish changes to the Anchorage Regulations in the Local Notice to Mariners.

(33 U.S.C. 471, 180, 258, 322, and 499; 49 CFR 1.46(c) and 1.45(b))

[CGFR 67–46, 32 FR 17727, Dec. 12, 1967, as amended by CGD 79–096, 44 FR 51585, Sept. 4, 1979; USCG–1998–3799, 63 FR 35526, June 30, 1998; USCG–2007–27887, 72 FR 45902, Aug. 16, 2007]

### § 109.07  Anchorages under Ports and Waterways Safety Act.

The provisions of section 4 (a) and (b) of the Ports and Waterways Safety Act as delegated to the Commandant of the

452

VerDate Sep<11>2014   15:49 Sep 19, 2023   Jkt 259138   PO 00000   Frm 00462   Fmt 8010   Sfmt 8010   Q:\33\33V1.TXT   PC31



U.S. Coast Guard in Pub. L. 107–296, 116 Stat. 2135, authorize the Commandant to specify times of movement within ports and harbors, restrict vessel operations in hazardous areas and under hazardous conditions, and direct the anchoring of vessels. The sections listed in §110.1a of this subchapter are regulated under the Ports and Waterways Safety Act.

[CGD 3–81–1A, 47 FR 4063, Jan. 28, 1982, as amended by USCG–2003–14505, 68 FR 9535, Feb. 28, 2003]

### §109.10 Special anchorage areas.

An Act of Congress of April 22, 1940, provides for the designation of special anchorage areas wherein vessels not more than sixty-five feet in length, when at anchor, will not be required to carry or exhibit anchorage lights. Such designation is to be made after investigation, by rule, regulation, or order, the procedure for which will be similar to that followed for anchorage grounds under section 7 of the Rivers and Harbors Act of March 4, 1915, as referred to in §109.05. The areas so designated should be well removed from the fairways and located where general navigation will not endanger or be endangered by unlighted vessels. The authority to designate special anchorage areas was transferred to and vested in the Secretary of Homeland Security by section 902(j) of the Coast Guard and Maritime Transportation Act of 2006 (Pub. L. 109–241, 120 Stat 516), and delegated to the Commandant of the U.S. Coast Guard in Department of Homeland Security Delegation No. 0170.1. The Commandant redelegated the authority to establish anchorage grounds to each Coast Guard District Commander as provided in 33 CFR 1.05–1(e)(1)(i).

[USCG–2007–27887, 72 FR 45902, Aug. 16, 2007]

### §109.15 Enforcement proceedings.

Proceedings against a vessel violating the Anchorage Regulations are to be brought in the name of the officer of the Coast Guard assigned for the time being as Captain of the Port. When the vessel is at a port where there is no Coast Guard officer, proceedings will be initiated in the name of the District Commander.

[CGFR 67–46, 32 FR 17727, Dec. 12, 1967, as amended by USCG–2007–27887, 72 FR 45903, Aug. 16, 2007]

### §109.20 Publication; notice of proposed rule making.

(a) Section 4 of the Administrative Procedure Act (5 U.S.C. 553), requires publication of general notice of proposed rule making in the FEDERAL REGISTER (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law), except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts. Except where notice or hearing is required by statute, this requirement does not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) General notice of proposed rule making published in accordance with the above will include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

[CGFR 67–46, 32 FR 17727, Dec. 12, 1967]

## PART 110—ANCHORAGE REGULATIONS

Sec.

110.1 General.
110.1a Anchorages under Ports and Waterways Safety provisions.
110.3 First Coast Guard District Special Anchorage Areas.

37
VerDate Sep<11>2014 15:49 Sep 19, 2023 Jkt 259138 PO 00000 Frm 00463 Fmt 8010 Sfmt 8010 Q:\33\33V1.TXT PC31
sfrattini on LAPCK6H6L3 with DISTILLER

## Subpart A—Special Anchorage Areas

110.4 Penobscot Bay, Maine.
110.5 Casco Bay, Maine.
110.6 Portland Harbor, Portland, Maine (between Little Diamond Island and Great Diamond Island).
110.6a Fore River, Portland Harbor, Portland, Maine.
110.8 Lake Champlain, N.Y. and Vt.
110.9 Wells Harbor, Maine.
110.10 Portsmouth Harbor, New Hampshire, north of Newcastle Island.
110.25 Salem Sound, Mass.
110.26 Marblehead Harbor, Marblehead, Mass.
110.27 Lynn Harbor in Broad Sound, Mass.
110.29 Boston Inner Harbor, Mass.
110.30 Boston Harbor, Mass..
110.31 Hull Bay and Allerton Harbor at Hull, Mass.
110.32 Hingham Harbor, Hingham, Mass.
110.37 Sesuit Harbor, Dennis, Mass.
110.38 Edgartown Harbor, Mass.
110.40 Silver Beach Harbor, North Falmouth, Mass.
110.45 Onset Bay, Mass.
110.45a Mattapoisett Harbor, Mattapoisett, Mass.
110.46 Newport Harbor, Newport, R.I.
110.47 Little Narragansett Bay, Watch Hill, R.I.
110.48 Thompson Cove on east side of Pawcatuck River below Westerly, R.I.
110.50 Stonington Harbor, Conn.
110.50a Fishers Island Sound, Stonington, Conn.
110.50b Mystic Harbor, Groton and Stonington, Conn.
110.50c Mumford Cove, Groton, Conn.
110.50d Mystic Harbor, Noank, Conn.
110.51 Groton, Conn.
110.52 Thames River, New London, Conn.
110.53 Niantic, Conn.
110.54 Long Island Sound, on west side of entrance to Pataguanset River, Conn.
110.55 Connecticut River, Conn.
110.55a Five Mile River, Norwalk and Darien, Conn.
110.55b Connecticut River, Old Saybrook, Connecticut.
110.56 Noroton Harbor, Darien, Conn.
110.58 Cos Cob Harbor, Greenwich, Conn.
110.59 Eastern Long Island, NY.
110.60 Captain of the Port, New York.
110.67 Delaware River, Essington, Pa.
110.70a Northeast River, North East, Md.
110.71 Jacobs Nose Cove, Elk River, Md.
110.71a [Reserved]
110.71b Wye River, Wye, Md.
110.72 Blackhole Creek, Md.
110.72a Chester River, southeast of Chestertown, Md.
110.72aa Elizabeth River Spectator Vessel Anchorage Areas, between Norfolk and Portsmouth, Virginia.
110.72b St. Simons Island, Ga.

110.72c Lake Murray, S.C.
110.72d Ashley River, SC.
110.73 St. Johns River, Fla.
110.73a Indian River at Sebastian, Fla.
110.73b Indian River at Vero Beach, Fla.
110.73c Okeechobee Waterway, St. Lucie River, Stuart, FL.
110.74 Marco Island, Marco River, Fla.
110.74a Manatee River, Bradenton, Fla.
110.74b Apollo Beach, Fla.
110.74c Bahia de San Juan, PR.
110.75 Corpus Christi Bay, Tex.
110.77 Amistad Reservoir, Tex.
110.77a Duluth-Superior Harbor, Duluth, Minn.
110.77b Madeline Island, WI.
110.78 Sturgeon Bay, Sturgeon Bay, Wis.
110.79a Neenah Harbor, Neenah, Wis.
110.79b Millers Bay, Lake Winnebago, Oshkosh, WI.
110.79c Fish Creek Harbor, Fish Creek, Wisconsin.
110.80 Milwaukee Harbor, Milwaukee, Wis.
110.80a Lake Macatawa, Mich.
110.80b Marquette Harbor, Marquette, Mich.
110.81 Muskegon Lake, Mich.
110.81a Lake Betsie, Frankfort, MI.
110.82 Charlevoix Harbor, Mich.
110.82a Little Traverse Bay, Lake Michigan, Harbor Springs, Mich.
110.83 Chicago Harbor, Ill.
110.83a Cedar Point, Sandusky, Ohio.
110.84 Black Rock Channel opposite foot of Porter Avenue, Buffalo, N.Y.
110.84b Buffalo, N.Y.
110.85 Niagara River, Youngstown, N.Y.
110.86 Sodus Bay, NY.
110.87 Henderson Harbor, N.Y.
110.90 San Diego Harbor, California.
110.91 Mission Bay, Calif.
110.93 Dana Point Harbor, Calif.
110.95 Newport Bay Harbor, Calif.
110.100 Los Angeles and Long Beach Harbors, Calif.
110.111 Marina del Rey Harbor, Calif.
110.115 Santa Barbara Harbor, Calif.
110.120 San Luis Obispo Bay, Calif.
110.125 Morro Bay Harbor, Calif.
110.126 Monterey Harbor, Calif.
110.126a San Francisco Bay, Calif.
110.127 Lake Mohave and Lake Mead, Nevada and Arizona.
110.127a Lake Powell, Utah-Arizona.
110.127b Flaming Gorge Lake, Wyoming-Utah.
110.127c Trinidad Bay, Calif.
110.128 Columbia River at Portland, Oreg.
110.129 Island of Hawaii, Hawaii.
110.129a Island of Kauai, Hawaii.
110.129b Island of Oahu, Hawaii. (Datum: OHD)
110.129c Apra Harbor, Guam. (Datum: WGS 84)

## Subpart B—Anchorage Grounds

110.130 Bar Harbor, Maine.

454

110.131 Sheepscot River in the vicinity of Edgecomb, Maine.
110.132 Rockland Harbor, Maine.
110.133 Kennebec River in vicinity of Bath, Maine.
110.134 Portland Harbor, Maine.
110.136 Lake Champlain, NY and VT.
110.138 Boston Harbor, Mass.
110.140 Buzzards Bay, Nantucket Sound, and adjacent waters, Mass.
110.142 Nantucket Harbor, Mass.
110.145 Narragansett Bay, R.I.
110.146 Long Island Sound.
110.147 New London Harbor, Conn.
110.148 Johnsons River at Bridgeport, Conn.
110.149 Narragansett Bay, RI.
110.150 Block Island Sound, N.Y.
110.155 Port of New York.
110.156 Randall Bay, Freeport, Long Island, N.Y.
110.157 Delaware Bay and River.
110.158 Baltimore Harbor, MD.
110.159 Annapolis Harbor, MD.
110.166 York River, Va., naval anchorage.
110.168 Hampton Roads, Virginia and adjacent waters.
110.170 Cape Fear, NC.
110.173 Port of Charleston, S.C.
110.179 Skidaway River, Isle of Hope, Ga.
110.182 Atlantic Ocean off Fort George Inlet, near Mayport, Fla.
110.183 St. Johns River, Florida.
110.184 Atlantic Ocean, Offshore Jacksonville, FL.
110.185 Atlantic Ocean, off the Port of Palm Beach, Fla.
110.186 Port Everglades, Florida.
110.188 Atlantic Ocean off Miami and Miami Beach, Fla.
110.189a Key West Harbor, Key West, Fla., naval explosives anchorage area.
110.190 Tortugas Harbor, in vicinity of Garden Key, Dry Tortugas, Fla.
110.193 Tampa Bay, Fla.
110.193a St. Joseph Bay, Fla.
110.194 Mobile Bay, Ala., at entrance.
110.194a Mobile Bay, Ala., and Mississippi Sound, Miss.
110.194b Mississippi Sound and Gulf of Mexico, near Petit Bois Island, Miss.
110.195 Mississippi River below Baton Rouge, LA, including South and Southwest Passes.
110.196 Sabine Pass Channel, Sabine Pass, Tex.
110.197 Galveston Harbor, Bolivar Roads Channel, Texas
110.205 Chicago Harbor, Ill.
110.206 Detroit River, Michigan.
110.207 Cleveland Harbor, Ohio.
110.208 Buffalo Harbor, N.Y.
110.209 Saint Lawrence Seaway Anchorages, New York.
110.210 San Diego Harbor, CA.
110.214 Los Angeles and Long Beach harbors, California.

110.215 Anaheim Bay Harbor, Calif., U.S. Naval Weapons Station, Seal Beach, Calif.; naval explosives anchorage.
110.216 Pacific Ocean at Santa Catalina Island, Calif.
110.218 Pacific Ocean at San Clemente Island, Calif.; in vicinity of Wilson Cove.
110.220 Pacific Ocean at San Nicolas Island, Calif.; restricted anchorage areas.
110.222 Pacific Ocean at Santa Barbara Island, Calif.
110.224 San Francisco Bay, San Pablo Bay, Carquinez Strait, Suisun Bay, Sacramento River, San Joaquin River, and connecting waters, CA.
110.228 Columbia River, Oregon and Washington.
110.230 Anchorages, Captain of the Port Puget Sound Zone, WA.
110.231 Ketchikan Harbor, Alaska, Large Passenger Vessel Anchorage.
110.233 Prince William Sound, Alaska.
110.235 Pacific Ocean (Mamala Bay), Honolulu Harbor, Hawaii (Datum: NAD 83).
110.236 Pacific Ocean off Barbers Point, Island of Oahu, Hawaii: Offshore pipeline terminal anchorages.
110.237 Pacific Ocean at Waimea, Hawaii, Naval Anchorage.
110.238 Apra Harbor, Guam.
110.239 Island of Tinian, CNMI.
110.240 San Juan Harbor, P.R.
110.245 Vieques Passage and Vieques Sound, near Vieques Island, P.R.
110.250 St. Thomas Harbor, Charlotte Amalie, V.I.
110.255 Ponce Harbor, P.R.

AUTHORITY: 33 U.S.C. 2071; 46 U.S.C. 70006, 70034; 33 CFR 1.05–1; Department of Homeland Security Delegation No. 00170.1, Revision No. 01.3.

SOURCE: CGFR 67–46, 32 FR 17728, Dec. 12, 1967, unless otherwise noted.

**§110.1 General.**

(a) The areas described in subpart A of this part are designated as special anchorage areas for the purposes of rule 30 (33 CFR 83.30) and rule 35 (33 CFR 83.35) of the Inland Navigation Rules, 33 CFR Chapter I, Subchapter E. Vessels of less than 20 meters in length; and barges, canal boats, scows, or other nondescript craft, are not required to sound signals required by rule 35 of the Inland Navigation Rules. Vessels of less than 20 meters are not required to exhibit anchor lights or shapes required by rule 30 of the Inland Navigation Rules.

(b) The anchorage grounds for vessels described in subpart B of this part are

455

established, and the rules and regulations in relation thereto adopted, pursuant to the authority contained in section 7 of the act of March 4, 1915, as amended (38 Stat. 1053; 33 U.S.C. 471).

(c) All bearings in the part are referred to true meridian.

(d) Geographic coordinates expressed in terms of latitude or longitude, or both, are not intended for plotting on maps or charts whose reference horizontal datum is the North American Datum of 1983 (NAD 83), unless such geographic coordinates are expressly labeled NAD 83. Geographic coordinates without the NAD 83 reference may be plotted on maps or charts referenced to NAD 83 only after application of the appropriate corrections that are published on the particular map or chart being used.

[CGFR 67–46, 32 FR 17728, Dec. 12, 1967, as amended by CGD 86–082, 52 FR 33811, Sept. 8, 1987; USCG–1998–3799, 63 FR 35526, June 30, 1998; USCG–2014–0410, 79 FR 38432, July 7, 2014]

### § 110.1a Anchorages under Ports and Waterways Safety provisions.

(a) The anchorages listed in this section are regulated under 46 U.S.C. Chapter 700, ''Ports and Waterways Safety'':

(1) Section 110.155 *Port of New York.*

(2) [Reserved]

(b) [Reserved]

[CGD 3–81–1A, 47 FR 4063, Jan. 28, 1982, as amended by CGD 96–052, 62 FR 16703, Apr. 8, 1997; USCG–2018–1049, 84 FR 7813, Mar. 5, 2019]

### § 110.3 First Coast Guard District Special Anchorage Areas.

Regulations designating special anchorage areas in the First Coast Guard District appear in §§ 110.4 through 110.60.

NOTE 1 TO § 110.3: Those planning to use these special anchorage areas are advised that state ordinances, local ordinances, or both, may apply. The local harbormaster is often the best source of information about any such ordinances.

[USCG–2019–0952, 88 FR 16187, Mar. 16, 2023]

## Subpart A—Special Anchorage Areas

### § 110.4 Penobscot Bay, Maine.

(a) *Rockland Harbor.* Beginning at a point bearing 244°, 1,715 yards, from Rockland Breakwater Light; thence 260°, 490 yards, to a point bearing 248° from Rockland Breakwater Light; thence 350°, 580 yards, to a point bearing 263° from Rockland Breakwater Light; thence 83°, 480 yards, to a point bearing 263° from Rockland Breakwater Light; and thence 169°, 550 yards, to the point of beginning. This area is limited to vessels no greater than 20 meters in length.

(b) *Camden Harbor, Sherman Cove and adjacent waters*—(1) *Anchorage A.* All of the waters enclosed by a line beginning at Eaton Point at latitude 44°12′31″ N, longitude 069°03′34″ W; thence to latitude 44°12′28″ N, longitude 069°03′33″ W; thence to latitude 44°12′32″ N, longitude 069°02′49″ W; thence along the shoreline to the point of beginning. DATUM: NAD83

(2) *Anchorage B.* All of the waters enclosed by a line beginning at Dillingham Point at latitude 44°12′12″ N, longitude 069°03′20″ W.; thence to latitude 44°12′14″ N, longitude 069°02′58″ W.; thence to latitude 44°12′19″ N, longitude 069°03′08″ W; thence to latitude 44°12′28″ N, longitude 069°03′13″ W; thence to latitude 44°12′26″ N, longitude 069°03′39″ W; thence along the shoreline to the point of beginning. DATUM: NAD83

(c) *Stonington Harbor, Deer Island Thorofare*—(1) *Crotch Island.* All of the waters bound by the following points beginning at the northeast shore of Crotch Island located at: latitude 44°08′51.0″ N, longitude 068°40′06.0″ W; thence southerly along the shoreline to latitude 44°08′36.0″ N, longitude 068°40′07.02″ W; thence to latitude 44°08′36.0″ N, longitude 068°40′04.02″ W; thence to latitude 44°08′46.98″ N, longitude 068°40′00.0″ W; thence to latitude 44°08′55.02″ N, longitude 068°39′49.02″ W; thence to latitude 44°08′54.0″ N, longitude 068°40′06.0″ W thence back to origin.

DATUM: NAD 83.

(2) [Reserved]

456

21°22′37″ N. latitude, 157°56′19″ W. longitude; thence along the shoreline to the beginning point.

[CGD 76–186, 42 FR 62001, Dec. 8, 1977, as amended at 43 FR 21881, May 22, 1978; CGD14–90–01, 56 FR 13762, Apr. 4, 1991. Redesignated by USCG–2018–0533, 85 FR 8173, Feb. 13, 2020]

### § 110.129c  Apra Harbor, Guam. (Datum: WGS 84)

(a) The waters bounded by a line connecting the following points:

| | |
|---|---|
| 13°27′45.5″ N | 144°39′34.8″ E |
| 13°27′32.0″ N | 144°39′36.3″ E |

and thence along the shoreline to the point of beginning.

(b) The waters bounded by a line connecting the following points:

| | |
|---|---|
| 13°26′53.6″ N | 144°40′03.8″ E |
| 13°27′04.0″ N | 144°40′04.8″ E |
| 13°27′04.0″ N | 144°40′09.8″ E |
| 13°27′10.0″ N | 144°40′09.8″ E |
| 13°27′10.0″ N | 144°40′23.8″ E |
| 13°26′51.0″ N | 144°40′23.8″ E |
| 13°26′51.0″ N | 144°40′06.0″ E |

and thence to the point of beginning.

[CGD14–89–01, 55 FR 27465, July 3, 1990. Redesignated by USCG–2018–0533, 85 FR 8173, Feb. 13, 2020]

## Subpart B—Anchorage Grounds

### § 110.130  Bar Harbor, Maine.

(a) *Anchorage grounds.* (1) Anchorage "A" is that portion of Frenchman Bay, Bar Harbor, ME enclosed by a rhumb line connecting the following points:

| Latitude | Longitude |
|---|---|
| 44°23′43″ N .................. | 068°12′00″ W; thence to |
| 44°23′52″ N .................. | 068°11′22″ W; thence to |
| 44°23′23″ N .................. | 068°10′59″ W; thence to |
| 44°23′05″ N .................. | 068°11′32″ W; returning to start. |

(2) Anchorage "B" is that portion of Frenchman Bay, Bar Harbor, ME enclosed by a rhumb line connecting the following points:

| Latitude | Longitude |
|---|---|
| 44°24′33″ N .................. | 068°13′09″ W; thence to |
| 44°24′42″ N .................. | 068°11′47″ W; thence to copied |
| 44°24′11″ N .................. | 068°11′41″ W; thence to |
| 44°24′02″ N .................. | 068°13′03″ W; returning to start. |

(b) *Regulations.* (1) Anchorage A is a general anchorage ground reserved for passenger vessels, small commercial vessels and pleasure craft. Anchorage B

is a general anchorage ground reserved primarily for passenger vessels 200 feet and greater.

(2) These anchorage grounds are authorized for use year round.

(3) Temporary floats or buoys for marking anchors will be allowed in all anchorage areas.

(4) Fixed moorings, piles or stakes are prohibited.

(5) Any vessels anchored in this area shall be capable of moving and when ordered to move by the Captain of the Port shall do so with reasonable promptness.

(6) The anchoring of vessels is under the coordination of the local Harbormaster.

[CGD–01–02–027, 67 FR 68518, Nov. 12, 2002]

### § 110.131  Sheepscot River in the vicinity of Edgecomb, Maine.

(a) *Anchorage grounds.* All of the waters enclosed by a line starting from a point located at the southwestern end of Davis Island at latitude 43°59.655′ N., longitude 69°39.617′ W.; thence to latitude 43°59.687′ N., longitude 69°39.691′ W.; thence to latitude 43°59.847′ N., longitude 69°39.743′ W.; thence to latitude 43°59.879′ N., longitude 69°39.559′ W.; thence to latitude 43°59.856′ N., longitude 69°39.488′ W.; thence to latitude 43°59.771′ N., longitude 69°39.585′ W.; thence to the point of beginning. DATUM: NAD 83

(b) *Regulations.* (1) This anchorage is reserved for vessels of all types, with drafts of 3 to 12 feet.

(2) These anchorage grounds are authorized for use from May through October.

(3) Vessels are limited to a maximum stay of 1 week.

(4) Fixed moorings, piles or stakes are prohibited.

(5) Vessels must not anchor so as to obstruct the passage of other vessels proceeding to or from other anchorage spaces.

(6) Anchors must not be placed in the channel and no portion of the hull or rigging of any anchored vessel shall extend outside the limits of the anchorage area.

490

# Chapter 52

## CRUISE SHIP DISEMBARKATION

§ 52-1.     Purpose.
§ 52-2.     Authority.
§ 52-3.     Validity and Severability.
§ 52-4.     Administration.
§ 52-5.     Definitions.

§ 52-6.     Requirements to Operate or Disembark at a CSDF.
§ 52-7.     Disembarkation Procedures.
§ 52-8.     Enforcement.

**[HISTORY: Adopted by the Town Council of the Town of Bar Harbor 6-18-2024 by Ord. No. 2024-06. Amendments noted where applicable.]**

## § 52-1. Purpose.

The purpose of this Chapter is to govern the disembarkation of Persons to docks or land within the Town from cruise ships and implement the purpose and intent of § 125-77H of the Town Code, as well as the promotion of the health, safety, and general welfare of the present and future inhabitants of the Town in a manner that serves to balance the interests of the general public and those of individual property owners.

## § 52-2. Authority.

Under federal, state and local law, the Town has regulatory authority over disembarkation of Persons into the Town. This Chapter is adopted pursuant to the Town's home rule powers as provided for in Article VIII, Part Second, of the Maine Constitution, 30-A M.R.S. §§ 2101 et seq.

## § 52-3. Validity and Severability.

If any section, subsection, clause, or phrase of this Chapter shall be found to be invalid or unconstitutional, such invalidity shall not affect the remaining provisions of this Chapter, and to that end the provisions of this Chapter are hereby declared severable.

## § 52-4. Administration.

The provisions of this Chapter shall be administered jointly by the Code Enforcement Officer and Harbor Master or their respective designee(s).

## § 52-5. Definitions.

Except as otherwise provided by this Chapter, language used herein shall be construed as set forth in § 125-108 of the Town Code and specific words and phrases shall have the meanings set forth in § 125-109 of the Town Code.

As used in this Chapter, the following terms shall have the following meanings:

CRUISE SHIP — "Cruise ship" has the same meaning as set forth in § 153-22B of the Town of Bar Harbor Code.

CRUISE SHIP DISEMBARKATION FACILITY ("CSDF") — A public or private property, or a public

Downloaded from https://ecode360.com/BA1953 on 2024-09-17

or private structure, used for disembarkation of persons arriving on land from cruise ships.

CSDF OWNER — An individual, corporation, governmental agency, municipality, trust, estate, partnership, association, two or more individuals having a joint or common interest, or other legal entity that owns, operates, or otherwise is authorized to represent the CDSF.

DISEMBARKATION — The arrival of persons to docks and/or land within the Town from cruise ships by tender vessels, or otherwise.

PERSONS — For purposes of this Chapter and the enforcement of § 125-77H, "Persons" means passengers of cruise ships and not those persons covered by 33 C.F.R. § 105.200 and 33 C.F.R. § 105.237 (titled "System for seafarers' access"), namely, "vessel personnel," "vessel crew," "seafarers assigned to a vessel," "pilots," and "representatives of seafarers' welfare and labor organizations" (collectively, "Crew"). The word "person" (i.e. not capitalized) shall have the meaning provided by § 125-108 of the Town Code.

## § 52-6. Requirements to Operate or Disembark at a CSDF.

A.   Permit Required: No person may allow or facilitate the disembarkation of Persons from a cruise ship over land or operate a CSDF without having first obtained a permit to operate a CSDF ("CSDF Permit").

B.   Cruise Ship Reservation Required: No CSDF or person shall receive disembarking Persons from a cruise ship that has not first received confirmation from the Harbor Master for a booked reservation for anchorage pursuant to the Town of Bar Harbor Cruise Ship Standard Operating Procedures, as they may be amended.

C.   Disembarkation Application and Permit Required:

   (1)   Application Required. A CSDF Owner shall submit an application to the Code Enforcement Officer, or designee, for a Disembarkation Permit to allow on a specified calendar day a specified number of Persons not exceeding 1,000 to disembark from one or more cruise ship(s) with a confirmed reservation for anchorage.

   (2)   Application Review. Applications shall be reviewed acted upon in the order in which they were received within 30 days of receipt. The application must identify the specific site of disembarkation, the calendar day of disembarkation, and the requested number of Persons to be disembarked to the identified CSDF and site of disembarkation on that calendar day.

   (3)   Issuance of Permit. Upon confirming the applicant has satisfied all other application criteria and requirements of this Chapter, the Code Enforcement Officer, or designee, shall grant the application and issue a Disembarkation Permit for the maximum number of Persons that does not cause the Daily Disembarkation Limit established by § 52-6C(4) of this Chapter to be exceeded.

   (4)   Daily Disembarkation Limit. The Code Enforcement Officer, or designee, shall not issue a Disembarkation Permit that would authorize the disembarkation of more than 1,000 Persons, in the aggregate, on a single calendar day, regardless of the total number of Disembarkation Permits requested or issued for a specific calendar day.

## § 52-7. Disembarkation Procedures.

A.   Counting Method. CSDF Owners shall employ a means to electronically count each individual person that disembarks at a given CSDF ("Counting Method"). The Counting Method must include a means

Downloaded from https://ecode360.com/BA1953 on 2024-09-17

for discounting from the total count of individuals all crew. The Counting Method shall be approved by the Harbor Master, or their respective designee, and subject to annual review.

B.  Daily Certification. For each Disembarkation Permit, the CSDF Owner shall submit a certification to the Code Enforcement Officer specifying how many Persons were in fact disembarked on the calendar day specified on the Disembarkation Permit and from what cruise ship said Persons disembarked.

C.  Code Enforcement Officer Access. Consistent with 30-A M.R.S. § 4452(1)(A), the Code Enforcement Officer, or designee, shall be permitted to access the site(s) of the CSDF at which Persons disembark, at any time during normal business hours, or at any time Persons are disembarking or embarking, for the purposes of ensuring and verifying that Persons are being counted properly. The CSDF shall not obstruct or otherwise interfere with said access. Whether access is necessary is within the sole discretion of the Code Enforcement Officer and Harbor Master. If access is denied, the Code Enforcement Officer may apply for an administrative search warrant pursuant to Maine Rule of Civil Procedure 80E.

D.  Code Enforcement Officer Audit. Upon request to the CSDF Owner, the Code Enforcement Officer, and their respective designee(s), shall have unobstructed and immediate access to the records and instruments used to implement the CSDF Counting Method for the purposes of auditing the CSDF Counting Method for accuracy and functionality and implementing and enforcing this Chapter and § 125-77H of the Town Code. Whether an audit is necessary is within the sole discretion of the Code Enforcement Officer. The CSDF Owner shall retain all records generated by the CSDF Counting Method for 3 years.

## § 52-8. Enforcement.

A.  Violation Report. If the Code Enforcement Officer, or designee, determines that the terms of this Chapter have been violated, including without limitation if a CSDF has disembarked Persons without a Disembarkation Permit or disembarked more Persons than authorized per this Chapter and any applicable Disembarkation Permit, the Code Enforcement Officer within a reasonable time of the alleged violation, shall create a Violation Report. The violation report should include the date and time of the incident giving rise to the violation, the tender dock where the violation occurred, who witnessed the violation, the number of Persons who disembarked over the Disembarkation Permit limit, and any other pertinent information as determined relevant by the Code Enforcement Officer.

B.  Penalties and Enforcement. This Chapter shall be enforced by the Code Enforcement Officer in accordance with §§ 125-100 and 125-101 of the Town Code. CSDF Owners, individuals, firms, associations, corporations, partnerships, trusts or other legal entities found to be in violation of this Chapter may be subject to such fines, penalties, actions, and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking Person exceeding the Disembarkation Permit is a distinct and separate violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized Person.

Downloaded from https://ecode360.com/BA1953 on 2024-09-17

## § 125-77. Permit required for certain activities. [Amended 5-7-1991; 11-2-1999]

After the effective date of this chapter, a written permit from the Code Enforcement Officer shall be required for the following activities, regardless of whether such activities have received site plan or subdivision approval or whether they also require review by the Design Review Board pursuant to Article XIII, Design Review:

A.  Flood hazard areas. All construction or earthmoving activities or other improvements within the one-hundred-year floodplain designated on the Flood Insurance Rate Maps published by the Federal Emergency Management Agency.

B.  New construction. New construction of buildings and structures.

C.  Alteration. Alteration of a building, structure, or land, or parts thereof, including but not limited to: [Amended 5-3-2004]

   (1)  Change in size of windows or doors;

   (2)  Repair of foundations, whether concrete, cinder block, granite and posts, or piles;

   (3)  Interior renovations for change in use;

   (4)  Remodeling interior walls to create new rooms;

   (5)  Enclosing open frame porch;

   (6)  Installing skylights;

   (7)  Erection of fences;

   (8)  Construction of new steps;

   (9)  Creation of roads or driveways;

   (10)  Erection of panels for winter closure or the erection of winter storm vestibules in the Downtown Village or Waterfront Development Districts; provided, however, that a permit need only be obtained in the first year of the useful life of the structure to be erected. [Amended 6-8-2010]

D.  Placement of signs. Placement of signs except temporary signs. [Amended 5-3-2004]

E.  Moving or demolition. All buildings or structures which are removed from or moved onto, or moved around within, a lot or demolished.

F.  Change of use. The change of any premises from one category of land use to any other land use.

G.  Activities. Any other activities described in Article III as requiring a permit from the Code Enforcement Officer.

H.  Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor. [Added 11-8-2022]

Downloaded from https://ecode360.com/BA1953 on 2024-09-18

(1) For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22B of the Town of Bar Harbor Code.

(2) As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

(3) The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77H shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

(4) This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77H(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.

(5) Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

Downloaded from https://ecode360.com/BA1953 on 2024-09-18

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) | |
| *Plaintiff-Intervenor*, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-416-LEW |
| TOWN OF BAR HARBOR, | ) ) | |
| *Defendant,* | ) ) | |
| CHARLES SIDMAN, | ) ) | |
| *Defendant-Intervenor* | ) ) | |

## STIPULATIONS

Plaintiffs the Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside" and with BH Piers, the "Pier Owners"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492" and together with 495 and 493, the "Tender Vessel Owners" or "Tender Owners") (herein, APPLL, the Pier Owners, BHWW, and the Tender Owners may be referred to collectively as "Plaintiffs"), Plaintiff-Intervenor Penobscot Bay and River Pilots Association ("Pilots

1

Association"), Defendant Town of Bar Harbor ("Defendant" or "the Town"), and Defendant-

Intervenor Charles Sidman ("Mr. Sidman") stipulate to the following:[1]

1. Bar Harbor is a popular port-of-call on a wide variety of cruise ship itineraries.

2. Both overnight and daytime visitors are drawn to Bar Harbor because of its

proximity to the Maine coast and Acadia National Park.

3. "PortCall" is a maritime software platform that provides users real-time data

related to vessel movements and port operations—obtained from port authorities, terminal

operators, or other entities responsible for overseeing port operations and/or vessel movement.

4. CruiseMaine, a part of the Maine Office of Tourism, maintains the PortCall

system for Maine ports, which posts some information for the general public at the following

uniform resource locator (URL) address: https://maine.portcall.com.

5. State funding supports CruiseMaine.

6. During the 2023 cruise season, foreign-flagged cruise vessels are scheduled to

spend, on average, approximately nine hours in their anchorage, based on scheduled arrival time

and departure time.

7. The two private piers of the Pier Owners receive disembarking passengers via

tenders from cruise vessels in Bar Harbor.

8. The Town does not have a definitive number for the number of tourists that come

into Bar Harbor.

9. In 2008, the Town accepted a recommendation from the Town's Cruise Ship

Study Task Force (which also recommended the formation of a standing Cruise Ship Committee)

---

[1] All parties reserve the right to stipulate to additional facts up to and during the trial.

to observe a policy of daily cruise passenger caps of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August.

10.     The daily passenger caps were calculated by using the lower berth capacity of cruise vessels.

11.     Following its establishment by the Town Council, the Cruise Ship Committee made annual recommendations on passenger caps for cruise ship season for the months April through November.

12.     The Town Council had the authority to accept or reject the Cruise Ship Committee's annual recommendations for cruise ship passenger caps.

13.     The Town Council has acted on the Cruise Ship Committee recommendations annually.

14.     From 2008 through 2021, the Town Council approved the Cruise Ship Committee's recommendations for passenger caps.

15.     On February 15, 2022, the Town Council approved the formation and membership of a working group, which, in turn, negotiated with the cruise industry for modifications of the daily passenger limits for 2023 and 2024 for cruise ships visiting Bar Harbor.

16.     On August 16, 2022, the Town Council initially approved a Memorandum of Agreement ("MOA") plan by a 5-2 vote.

17.     After several months of discussions and revisions, the MOA was finalized on September 28, 2022.

18.     The MOA included a shortened cruise ship season, by eliminating the months of April and November, and lower passenger caps that, in almost all cases, would reduce the number of daily cruise visitors disembarking at Bar Harbor.

19.     The Town Council approved the passenger caps in the MOA with the individual cruise lines.

20.     In September and October of 2022, the Town entered into MOAs with cruise lines.

21.     On August 2, 2022, the Town Council voted to place a citizen's initiative (the "Initiative") on the warrant articles calling the November town meeting warrant.

22.     Pursuant to the Town Charter, Article 3 became the Ordinance, effective December 8, 2022.

23.     Generally, cruise itineraries are published 24 to 30 months from the first sailing in a given season.

24.     Bar Harbor serves as a United States Customs and Border Protection ("CBP") Class A port of entry for foreign-flagged cruise vessels re-entering the United States.

25.     Foreign-flagged cruise vessels re-entering the United States that cannot call at Bar Harbor will need to call at another CBP Class A port.

26.     The Port of Portland is a CBP Class A port for foreign-flagged cruise vessels re-entering the United States.

27.     The port of entry at Portland is an approximately 170-mile drive from Acadia National Park.

28.     The Port of Eastport is a CBP Class A port for foreign-flagged cruise vessels re-entering the United States.

4

29.     The port of entry at Eastport is an approximately 110-mile drive from Acadia National Park.

30.     The port of entry at Bar Harbor is an approximately 2-mile drive from Acadia National Park.

31.     American Cruise Lines (ACL) vessels that call at Bar Harbor sail under the flag of the United States.

32.     Prior to the COVID-19 pandemic, approximately 158 cruise ships, with a combined lower berth capacity of 249,080 passengers, called at Bar Harbor in 2019.

33.     Pilotage is a regulated industry.

34.     The Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission.

35.     The Pilots Association's pilotage region extends 75 miles across from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.

Dated this 20th day of June, 2023.

                     Respectfully submitted,

                     /s/ Janna L. Gau_____
                     Timothy C. Woodcock, Bar #1663
                     P. Andrew Hamilton, Bar # 2933
                     Patrick W. Lyons, Bar #5600
                     Janna L. Gau, Bar #6043

                     EATON PEABODY
                     80 Exchange Street  (04401)
                     Post Office Box 1210
                     Bangor, ME 04402-1210
                     (207) 947-0111
                     twoodcock@eatonpeabody.com
                     ahamilton@eatonpeabody.com
                     plyons@eatonpeabody.com
                     jgau@eatonpeabody.com

                     Attorneys for Plaintiffs

                     */s/ Kathleen Kraft*
                     C. Jonathan Benner (*pro hac vice*)
                     Kathleen E. Kraft (*pro hac vice*)
                     Thompson Coburn LLP
                     1909 K Street N.W., Suite 600
                     Washington, D.C. 20006
                     (202) 585-6900 (main)
                     (202) 585-6969 (fax)
                     kkraft@thompsoncoburn.com
                     jbenner@thompsoncoburn.com

                     John Kingston (*pro hac vice*)
                     Thompson Coburn LLP
                     One U.S. Bank Plaza
                     St. Louis, Missouri 63101
                     (314) 552-6000 (main)
                     (314) 552-7000 (fax)
                     jkingston@thompsoncoburn.com

6

Twain Braden
Thompson Bowie & Hatch LLC
415 Congress Street
P.O. Box 4630
Portland, ME 04112-4630
(207) 774-2500
tbraden@thompsonbowie.com

Attorneys for Plaintiff-Intervenor

AND

*/s/ Allison A. Economy, Esq.*
Allison A. Economy, Bar No. 5336
aeconomy@rudmanwinchell.com
*/s/ Jonathan P. Hunter, Esq.*
Jonathan P. Hunter, Bar No. 4912
jhunter@rudmanwinchell.com
*/s/ Stephen W. Wagner, Esq.*
Stephen W. Wagner, Bar No. 5621
swagner@rudmanwinchell.com
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.947.4501

*Attorneys for Defendant Town of Bar Harbor*

*/s/ Robert Papazian*
David P. Silk, Esq., Bar No. 3136
Robert Papazian, Esq., Bar No. 6491
CURTIS THAXTER LLC
One Canal Plaza, Suite 1000/P.O. Box 7320
Portland, Maine 04112-7320
(207) 774-9000
dsilk@curtisthaxter.com
rpapazian@curtisthaxter.com

Attorneys for Defendant-Intervenor
Charles Sidman

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th  day of June, 2023, I caused the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

/s/ Janna L. Gau_____

Janna L. Gau

8

54